# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 98-KA-00372-SCT

*OMAR K. HUMPHREY a/k/a/ OMAR KHAYYAN HUMPHREY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/11/1998 |
| TRIAL JUDGE: | HON. ANDREW C. BAKER |
| COURT FROM WHICH APPEALED: | TATE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DAVID L. WALKER |
| | JOHN D. WATSON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JOHN R. HENRY, JR. |
| DISTRICT ATTORNEY: | ROBERT L. WILLIAMS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/20/2000 |
| MOTION FOR REHEARING FILED: | 5/11/2000 |
| MANDATE ISSUED: | |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. At the conclusion of a jury trial in the Circuit Court of Tate County, Mississippi, Omar K. Humphrey was convicted of capital murder and sentenced by the jury to life imprisonment without the possibility of parole. Humphrey appeals and urges thirteen issues as grounds to reverse. Because we find no reversible error, we affirm Humphrey's conviction for capital murder and affirm the sentence of life imprisonment without parole.

## FACTS AND PROCEEDINGS BELOW

¶2. Virginia Warner Phillips lived with her husband, Blue Phillips. Mrs. Phillips was 75 years of age. Her husband was suffering from the latter stages of senile dementia and was entirely dependent upon her. They both lived on the ground floor of their house in Senatobia, Mississippi. Mr. and Mrs. Phillips were assisted by a home health nurse, Mrs. Mary Cossey, as well as Miss Jean Epps who was employed to sit with Mr. Phillips. During the early morning hours of October 31, 1996, someone broke into the home of Mr. and

Mrs. Phillips. Between 10.30 and 11.00 a.m. that day Mrs. Cossey, the home health nurse, arrived at her usual time but was unable to gain access to the house. Unusually, the doors were locked, and the shades were drawn. Mrs. Cossey obtained a key from Mrs. Phillips's daughter, Gail Cushman and entered the house. She found Mrs. Phillips on the floor, tied up with duct tape, with a chair and quilt upon her. She was unable to reach Mr. Phillips as the house had apparently been ransacked. Unable to get a dial tone on the telephone, Mrs. Cossey ran screaming from the house and eventually flagged down a passing police officer.

¶3. The burglars gained access to the house by prying open a downstairs window. An investigative team from the Highway Patrol found that both telephone and electrical wires to the house had been cut. Outside of a screen door which had been propped open the investigators found a screwdriver and a pair of electrical pliers, the handles of which had been bound in black electrical tape. A flashlight was also found. This flashlight contained a battery found to have a fingerprint left on it by Humphrey. The window where the burglars had gained entry had some "sheer" curtains lying beside it outside of the house, the window and the screen were left open, and the flashlight and a small butterfly knife were found there.

¶4. In the field immediately behind the house were found a pair of womens glasses and fabric imprints in the mud, apparently made by a sock. The investigator testified that based on the fact that two separate tracks were found outside the house, at least two persons were involved in the crime. In addition, some shoe imprints were also found, apparently made by a typical tennis shoe.

¶5. Once inside the house it appears that the burglars proceeded to tie Mrs. Phillips at the hands, face and feet with duct tape, ultimately resulting in her death through asphyxiation, according to the pathologist who conducted the autopsy. There was also extensive bruising, particularly defensive type bruises, with bruises and abrasions to the face, chest, forearms, hands, the shoulder, and extensive bruising to the shins and calves of both legs. The pathologist testified that in his opinion Mrs. Phillips had suffered a severe beating, had been "hog-tied" and dragged for a distance. Given the state of health of Mrs. Phillips, which was good for a 75 year old lady, the pathologist believed it would have taken at least two people to subdue and tie her. Her death was caused by asphyxia, not through strangulation or the obstruction of the airways. In the opinion of the pathologist the death from asphyxia was caused in part by the duct tape placed around her mouth, and in part by the additional compressive forces on her lungs resulting from her being left in a position that exerted pressure on her diaphragm leading to the eventual collapse of certain sections of her lungs. Death was not instantaneous. There was significant pooling of the blood in the organs, indicating a slow death.

¶6. Humphrey was indicted by the Grand Jury of Tate County on November 6, 1997, for Conspiracy to Commit Burglary and the Capital Murder of Virginia Phillips. Humphrey filed a motion for a speedy trial on March 17, 1997. Humphrey filed a motion to suppress oral statements on June 10, 1997, and a motion to suppress physical evidence seized from his person on August 20. 1997. The circuit court issued an order denying the motion to suppress physical evidence seized from Humphrey's person on August 29, 1997. An order of continuance was issued on August 29, 1997. An order denying the motion to suppress statements was entered on September 2, 1997. Upon a joint motion by the State and Humphrey's attorney, an order of continuance was filed on September 24, 1997, re-setting the trial for November 3, 1997. An order to continue and reset trial was entered on November 7, 1997, and trial was set for February 9, 1998, in the Chancery courthouse in Panola County. Humphrey was re-indicted on charges of Conspiracy to Commit Burglary and the Capital Murder of Virginia Phillips in order to comply with the requirements of *State v. Berryhill*, 703 So.2d 250 (Miss. 1997). It was agreed by the State and by Humphrey and his counsel that

all matters previously filed in cause no. CR- 97-29-B (T) should carry over and be made part of CR 97-155-B (T) as though originally filed therein, and an order was filed to this effect on November 21, 1997. Humphrey filed a motion to dismiss the indictment on Sixth Amendment speedy trial grounds on December 3, 1997. Humphrey also filed a motion to suppress evidence on December 3, 1997. The circuit court issued an order denying the motion to suppress evidence, and an order denying the motion to dismiss indictment on Sixth Amendment speedy trial grounds was filed on January 16, 1998. After trial took place on February 2, 3, 4, 5, 6, and 7, 1998, the jury unanimously found Humphrey guilty of the crime of capital murder, and Humphrey was sentenced to a term of life imprisonment without parole. Humphrey filed a motion for a new trial, or in the alternative for a judgment notwithstanding the verdict on February 12, 1998. An order overruling post trial motions was filed February 12, 1998, and entered nunc pro tunc on October 9, 1998. Humphrey filed a notice of appeal on February 17, 1998.

## STATEMENT OF THE LAW

### 1. WHETHER THE TRIAL COURT ERRED IN DENYING MR. HUMPHREY'S MOTION FOR A MISTRIAL BECAUSE THE PROSECUTOR MADE A "SEND A MESSAGE" TYPE ARGUMENT

¶7. During closing arguments of the sentencing phase of the trial, the District Attorney made the following statement:

> So what is the proper punishment? These are your options. If you follow them, follow this road map, you'll get there. And no one, no one, folks, has the right to second guess any decision you make. All we want you to do is what's right. My view of the case, obviously, you know by now. I've seen too much of this for the 20 years that I've served as prosecutor in this District, way too much of it. Somehow, some way, it's just got to stop. It's got to stop. Maybe, just maybe, the sentence of death comes out of that jury room, there's somebody who'll see or read about it who'll have second thoughts about going into someone else's house.

¶8. At this point Humphrey's attorney objected, suggesting that the District Attorney was making a send a message type argument of the kind which has been condemned by this Court and moved for a mistrial. The circuit court sustained the objection, advised the District Attorney that he was "treading into an area that the Supreme Court has asked us to stay away from," but denied the motion for a mistrial. Humphrey asserts that the trial court was correct in sustaining the objection, but erred in denying the motion for mistrial. Humphrey recognizes that the prosecutor did not literally use "send a message" terminology, but argues that it could be inferred from the context in which it was used, and that such a statement warrants reversal. The State argues that any alleged improper remarks, if any, made during summation were cured by the trial court's sustaining the objection, and by the instruction submitted to the jury instructing them to disregard any argument, statement or remark made by counsel having no basis in evidence. The State further argues that the danger of a send a message type argument does not exist at the sentencing phase of a trial where sending a message is necessarily entailed in imposing the death penalty in view of the fact that deterrence is one of that penalty's goals.

¶9. During the guilt phase of the trial the role of the jury is to weigh the evidence and to apply the law, not to "send a message," as this Court has made clear. *Williams v. State*, 522 So.2d 201, 209 (Miss. 1988). The situation is much different during the sentencing phase of the trial. In this case the alleged send a message argument occurred during the sentencing phase of the bifurcated trial, after the determination of

guilt had been made by the jury, and during consideration of the death penalty. Prosecutors have been allowed the use of send a message type arguments during the sentencing phase of a trial. We have noted that

> . . . the danger inherent in the "send a message" argument is that jurors will neglect their duty to determine whether "the evidence showed the defendant to be guilty of the crime charged." 522 So.2d at 209. This danger does not exist at the sentencing phase, where the defendant has already been found guilty of capital murder. The sole determination to be made at this point is whether the death penalty should be imposed. We choose not to fault the prosecution for arguing that the "message" conveyed by a death penalty verdict would be different than that urged by the defense. To do so would be disingenuous given the inescapable reality that deterrence is, in fact, an established goal of imposing the death penalty, which goal necessarily entails, to some extent, sending a message. The trial court did not err in permitting this argument by the prosecution.

*Wells v. State*, 698 So.2d 497, 513 (Miss. 1997).

¶10. Where the purpose of the statement is to help determine whether the death penalty should be imposed, the prosecution is permitted to argue that the "message" conveyed by the death penalty verdict would be different than that of a lesser sentence. *Id.* This is precisely the situation in the present case. Therefore this assignment of error is without merit.

### 2. WHETHER THE TRIAL COURT COMMITTED MANIFEST ERROR IN DENYING MR. HUMPHREY'S MOTION TO DISMISS INDICTMENT FOR FAILURE TO PROVIDE HIM WITH A SPEEDY TRIAL

¶11. Though Humphrey does not raise the issue on appeal, it is worthy of note that the Legislature has addressed the speedy trial question by statute, Miss. Code Ann. § 99-17-1 (1994), which states that unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than 270 days after the accused has been arraigned. The record shows that when the State, Humphrey and his counsel agreed that all matters previously filed in cause number CR- 97-29-B(T) should carry over and be made part of CR 97-155-B(T) in order to comply with the requirements of *State v. Berryhill*, 703 So.2d 250 (Miss.1997) the following discourse took place on November 7, 1997:

THE COURT:

All right. Mr. Walker, have you and Mrs. Lamar reached an agreement as to how discovery would be handled under this new cause number? We've got a case that dates back some 10 or 15 years ago that came out of Tallahatchie County that gave us some guidance that discovery, you ought to have an agreement**.**

MR. WALKER [Humphrey's attorney]:

I think we do, Your Honor. I made Ms. Lamar aware of one concern. I have no problem incorporating the motion hearings previously held in here in this case, the discovery and all the motions. But I told Mrs. Lamar that I wanted to be up front with her and get this clear with respect to any Sixth Amendment speedy trial claim that we may file later on that our position is that his speedy trial rights run from the date of his arrest from the Sixth Amendment standpoint and that just because

she reindicted him or Mr. Williams did that -

THE COURT:

I think you're right. In other words, if you made a speedy trial claim, not a 270 day claim, but at least a speedy trial, I would have to look from the date of --

MR. WALKER:

Yes, sir. I told her with that understanding of my position and Mr. Humphrey's position, then I have no problem incorporating everything previously done in the prior file into the new file.

¶12. The trial court heard a pre-trial motion to dismiss the indictment on an alleged speedy trial violation on Friday January 16, 1998, and the record shows the following:

MRS. LAMAR [the prosecutor]:

Your Honor, do I understand by reference to the motion that was filed that this is a speedy trial motion that was filed under Amendment Six of the Constitution and not under the statutory 270 day rule?

MR. WALKER:

That's correct, Your Honor.

THE COURT:

Okay: The Barker v. Wingo standard.

¶13. It is clear from the record that Humphrey was unable to assert a 270 day violation because of the second indictment. The trial court then held a hearing to assess the speedy trial motion in light of the constitutional analysis set forth in ***Barker v. Wingo***, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). A trial judge's finding is entitled to the same deference as a jury verdict and will not be reversed upon appeal unless manifestly wrong. ***Jenkins v. State***, 607 So.2d 1137, 1138 (Miss. 1992) (collecting authorities). A delay in excess of eight (8) months is presumptively prejudicial, ***Smith v. State***, 550 So.2d 406, 408 (Miss. 1989). Once a delay is presumptively prejudicial, the State must rebut this presumption of prejudice. For constitutional purposes the right to a speedy trial attaches and the time begins to run at the time of the arrest. ***Handley v. State***, 574 So2d 671, 674 (Miss. 1990). The appropriate test, which was undertaken by the trial court, in considering whether a defendant receives a speedy and public trial in compliance with the Sixth Amendment of the U.S. Constitution and Article 3, Section 26 of the Mississippi Constitution, is that set forth in ***Handley***, at 673 whereby Mississippi adopted the factors set forth in ***Barker v. Wingo***, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) which provides the following four-step functional analysis:

First, we must calculate the time periods. Second, we must analyze those time periods in light of all circumstances, including the conduct of both the prosecution and the defendant, in conjunction with the Barker factors: (1) length of the delay; (2) reason for the delay; (3) defendant's timely assertion of his right to a speedy trial; and (4) resulting prejudice to the defendant. Vickery, 535 So.2d at 1376. Third, we must weigh each of these factors in light of the particular facts of the case, keeping in mind

that it is often "impossible to determine with precision when the right has been denied." Barker, 407 U.S. at 521, 92 S.Ct. at 2187.

*Handley*, at 676.

### 1. Length of the Delay

¶14. All parties are in agreement that the length of time between Humphrey's arrest on December 9, 1996, and the date of his trial, February 2, 1998, was 420 days. This being longer than eight months the State has the burden of overcoming the presumption of prejudice.

### 2. Reason for the Delay

¶15. Humphrey was arrested on a charge of capital murder of Mrs. Phillips on December 9, 1996. This is the point at which the right to a speedy trial attaches for constitutional purposes and the time begins to run. The original indictment of Humphrey was on November 6, 1996, for conspiracy to commit burglary and capital murder. Humphrey filed a motion for a speedy trial on March 17, 1997. Humphrey filed a motion to suppress oral statements on June 10, 1997 and a motion to suppress physical evidence seized from his person on August 20, 1997. The circuit court issued an order denying the motion to suppress physical evidence seized from Humphrey's person on August 29, 1997. An order of continuance was filed on August 29, 1997 due to a scheduling conflict with another trial for murder and aggravated assault. An order denying the motion to suppress statements was issued on September 2, 1997.

¶16. Upon a joint motion by the State and Humphrey an order of continuance was filed on September 24, 1997, re-setting the trial for November 3, 1997, which stated that all federal and state statutory and constitutional rights to a speedy trial were thereby tolled. An order to continue and re-set trial was issued on November 7, 1997, and trial was set for February 9, 1998 in the Chancery courthouse in neighboring Panola County. This was due to the fact that renovations to the Tate County courthouse were ongoing and because the courtroom was not equipped for a sequestered jury. The Tate County Courthouse was unavailable, and neither was any other in the district. The trial court's alternative location in Panola county was unavailable, though efforts were made to get a courtroom there. The court also looked into finding a suitable courthouse in neighboring DeSoto county, but there was not a hotel available to house the sequestered jury. These delays were through no fault of the prosecution, and it is evident from the record that all parties made every effort to speed things along.

¶17. Humphrey was re-indicted on November 6, 1997 on charges of conspiracy to commit burglary and the capital murder of Virginia Phillips. The Court was advised that this action was taken to comply with the requirements of *State v. Berryhill*, 703 So.2d 250 (Miss. 1997). After a formal reading of the indictment and a plea of not guilty entered by Humphrey, it was agreed by the State, by Humphrey and his counsel that all matters previously filed in cause number CR- 97-29-B (T) should carry over and be made part of CR 97-155-B (T) as though originally filed therein. An order was filed to this effect on November 21, 1997.

¶18. Humphrey filed a motion to dismiss indictment on Sixth Amendment speedy trial grounds on December 3, 1997. Humphrey also filed a motion to suppress evidence on December 3, 1997. The Court issued an order denying the motion to suppress evidence, and an order denying the motion to dismiss indictment on Sixth Amendment speedy trial grounds on January 16, 1998. Trial took place on February 2, 3, 4, 5, 6, and 7, 1998.

¶19. Humphrey contends that he was not responsible for any of the delays, was ready to go to trial at any time, and that the only conceivable delay was his request for a continuance while DNA testing be performed on a hair sample. The prosecution could not avoid the delays caused by the state of the Tate County courthouse, the unsuitability of the other facilities it attempted to locate, or the crowded docket. Though docket congestion will not automatically suffice to establish good cause, this Court has on several occasions held it good cause for delay, with the burden resting on the State to positively demonstrate that the backlog was the cause of the delay. *See Walton v. State, 678 So.2d 645, 648 (Miss. 1996)*. The record reflects that the docket was indeed congested with other high priority cases, and that the State demonstrated positively that this contributed to the delays. It is also clear from the record that several other factors beyond the control of the State contributed toward the delays. Also, it is neither practical or desirable to go to trial when discovery is still ongoing and there were motions from the defense which needed to be addressed. This prong weighs in favor of the State.

### 3. Defendant's Assertion of his Right to a Speedy Trial

¶20. Humphrey first asserted his right to a speedy trial on March 17, 1997. This prong of the *Barker* test therefore weighs in his favor. However it should also be noted that Humphrey virtually contemporaneously filed a number of motions requiring hearings and rulings by the trial court.

### 4. Prejudice to the Defendant[1]

¶21. Humphrey asserts that he was prejudiced because he was housed in the DeSoto County jail in Hernando. Specifically, he asserts that he was isolated from his family in Senatobia, who had difficulty visiting him and that he was exposed to fights and racial slurs. While such an environment is obviously unpleasant, there is nothing to show that this prejudiced his defense. Humphrey claims he was prejudiced by the death of a potential witness, Mrs. Schneller. Because this potential witness died prior to the original indictment it is impossible to see how Humphrey was prejudiced because he could never have called her as a witness. Humphrey claimed that he was prejudiced by the reindictment in that it rendered him unable to make the statutory 270 day claim that he did not receive a speedy trial. However, the reason for the reindictment was to ensure conformance with *Berryhill*, a case that placed a greater burden on the State in order to conform to a change in the law. ( *Berryhill* requires that a capital murder indictment which is predicated upon the underlying crime of burglary must specifically state the intended felony which comprises the charged burglary, and must contain an allegation of the specific criminal intent that constitutes an element of the burglary). 703 So.2d at 252. All parties agreed to the reindictment, and agreed that all prior pleadings, motions etc. should carry over. Humphrey was more than willing to receive the benefit of the change in the law, and it did not prejudice Humphrey for the trial court to comply with *Berryhill*.

¶22. The record does not support Humphrey's assertion that he was denied a speedy trial under the Sixth Amendment of the U.S. Constitution and Article 3, Section 26 of the Mississippi Constitution. The trial court held an extensive *Barker* hearing to weigh the four factors. There is absolutely no evidence in the record that the State in any way intentionally protracted the trial process, and it is apparent that all parties worked to bring Humphrey to trial as soon as was practically possible. Though the trial court was correct to hold a *Barker* hearing in light of the length of the delay, its findings that the State provided reasonable and legitimate reasons for the delays, which did not result from the State's fault or intention, and the finding that Humphrey was not prejudiced by the delays, tip the balance of the *Barker* factors in favor of the State. Because there is nothing in the record to show the trial court was not manifestly wrong in this determination,

Humphrey's assignment of error on constitutional speedy trial grounds is without merit.

### 3. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING MR. HUMPHREY'S MOTION TO SUPPRESS ORAL STATEMENTS MADE BY HIMSELF TO PATRICK REID.

¶23. Humphrey filed a motion in limine to exclude oral statements which he allegedly made concerning the murder of Mrs. Phillips to Patrick Reid, an inmate and sometime cellmate around December, 1996. Reid reported these alleged statements to law enforcement officials on December 27 and 30, 1996. Humphrey objected at trial that any statements that he may have made which were obtained by Reid would violate his rights under the Fifth and Sixth Amendments of the U.S. Constitution, as well as Article 3, Section 26 of the Mississippi Code. A hearing was held on this issue by the trial court, the motion was overruled, and the testimony admitted.

¶24. At the hearing Randy Doss of the DeSoto County Sheriff's Department testified that he received a communication from a jailer that Patrick Reid wished to speak to him. Reid told Detective Doss that Omar Humphrey had spoken to him about a homicide in Senatobia in Tate County. Detective Doss relayed this information to the Senatobia police department. The Senatobia police department sent investigators to the jail to speak to Reid. Pursuant to their conversations with Reid, the officers met with personnel from the district attorney's office, and it was agreed that a wire would be placed on Reid. Lieutenant Perez also took down an oral statement concerning the death of Mrs. Phillips from Reid which was read back to him and then signed.

¶25. Nothing in the record indicates that Reid was an agent of the State. Reid was not in any way involved or implicated in the crimes charged against Humphrey. It was Reid who approached the State with the information, he was not solicited by the State to act as an informant against Humphrey. Reid had in the past provided incriminating statements as an informer in another matter, but this is not relevant to the current case. Humphrey cites **McNeal v. State**, 551 So.2d 151 (Miss. 1989) which questioned the reliability of jailhouse "snitches" where information against fellow inmates is exchanged for reduced sentences. There is nothing in the record to indicate that Reid somehow cut a deal with law enforcement. In fact the decision to tender a plea offer to Reid was made and communicated to him *before* he tendered any information regarding Humphrey.

¶26. Unlike in **Page v. State**, 495 So.2d 436 (Miss. 1996), Reid was not a co-defendant, and there is no evidence in the record of surreptitious solicitation by the State. Reid did engage Humphrey in conversation about the crime, and Humphrey did incriminate himself, if Reid's testimony is to be believed, which the jury apparently did. Because the record fails to establish that Patrick Reid was acting as an agent of the State, Humphrey waived any Fifth Amendment rights against self-incrimination and Sixth Amendment rights to counsel under the U.S. Constitution and under Article 3, Section 26 of the Mississippi Constitution, when he voluntarily talked to Reid about his crimes. This assignment of error is without merit.

### 4. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING PHOTOGRAPHS OF THE BODY OF THE DECEASED MRS. PHILLIPS INTO EVIDENCE.

¶27. Humphrey made a motion in limine to exclude or in the alternative to limit photographic evidence depicting the body of Mrs. Phillips, claiming that their probative value is substantially outweighed by their

prejudicial effect on the jury and that their introduction violated Rules 401, 402, and 403 of the Mississippi Rules of Evidence. Humphrey also objected on the grounds that their introduction denied him a fair trial as guaranteed by the Fourteenth Amendment of the U.S. Constitution, and Article 3, Section 14 of the Mississippi Constitution.

¶28. Humphrey objected that the photographs were enlarged, cumulative, gruesome and inflammatory as characterized in *Jackson v. State*, 672 So.2d 468 (Miss. 1996) and *Noe v. State*, 616 So.2d 298 (Miss. 1993). The trial court overruled these objections and admitted the photographs into evidence, finding all of them to be more probative than prejudicial for purposes such as showing the position of the body and the extent of the injuries. Humphrey cites the correct test and standard of review for the admissibility of "gruesome" photographs:

> In arriving at the finding above, we do not presume to conclude that every gruesome photograph admitted into evidence constitutes an abuse of discretion; however, when presented with photographs such as the ones in this case, we caution the trial judge to carefully consider all the facts and circumstances surrounding the admission of this particular type of evidence. More specifically, the trial court must consider: (1) whether the proof is absolute or in doubt as to identity of the guilty party, as well as, (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury.

*McNeal v. State*, 551 So.2d 151, 159 (Miss. 1989).

¶29. The admissibility of photographs rests with the sound discretion of the trial judge, and unless an abuse of discretion is shown, the decision will be upheld on appeal. *Taylor v. State*, 672 So.2d 1246, 1270 (Miss. 1996). There is nothing in the record to indicate that the admission of the photographs was simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury. The photographs established that Mrs. Phillips was dead as a result of a criminal act, and the extent, position, and nature of the wounds the victim sustained. The photographs assisted the jury in visualizing the crime scene and corroborated the testimony of the investigators of the crime scene. Humphrey's argument that the admissibility of the photographs was in error is not supported by the record or by the law, and is without merit. The circuit court did not abuse its discretion in admitting the photographs. *See also Watts v. State*, 733 So.2d 214, 233 (Miss. 1999).

### 5. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING MR. HUMPHREY'S MOTION TO EXCLUDE TESTIMONY CONCERNING HIS HAVING POSSESSION OF A FIREARM SEVERAL DAYS PRIOR TO THE MURDER OF MRS. PHILLIPS

¶30. Humphrey made a motion in limine to exclude anticipated testimony of Reggie Brooks concerning Humphrey having a pistol in his possession two days prior to the murder, which he allegedly said he was going to use should anything go wrong during the burglary. The basis for the objection was that the testimony would be irrelevant because there was no proof that Humphrey had a gun in his possession on the night of the murder and that the comment was remote from the actual homicide. Humphrey asserts that testimony about a gun two nights prior to the murder would be more prejudicial than probative and should have been excluded based on Rule 403 of the Mississippi Rules of Evidence. The judge ruled that the testimony was admissible evidence which goes to the issue of whether there was a prior plan or agreement, and that the 48 hour period was not too remote.

¶31. Evidentiary rulings of a trial judge will not be disturbed absent of a showing of a clear abuse of discretion. *Shamblin v. State,* 601 So.2d 407, 412 (Miss. 1992) (collecting authorities). There is nothing in the record to indicate that the circuit judge abused his discretion. The testimony regarding the pistol was relevant to show Humphrey's alleged plan, preparation and intention to burglarize Mrs. Phillips home, and relevant to the issue of the intent or capacity of Humphrey to inflict death should his plans be interfered with. Evidence of this type and for these purposes is admissible. *See Smith v. State*, 729 So.2d 1191, 1205 (Miss. 1998). The question of the remoteness in time from the witness seeing Humphrey with the gun and the murder of Mrs. Phillips is also subject to the familiar clear abuse of discretion standard of review. *Stewart v. State*, 226 So.2d 911, 912 (Miss. 1969). The 48 hour time period between the witness seeing Humphrey with the pistol and the murder of Mrs. Phillips is not so excessive as to constitute an abuse of discretion for its inclusion for consideration by the jury.

### 6. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REFUSING TO GRANT MR. HUMPHREY'S REQUESTED LESSER INCLUDED OFFENSE JURY INSTRUCTIONS FOR LESSER INCLUDED MURDER, LESSER INCLUDED MANSLAUGHTER, AND PROPOSED ACCESSORY AFTER THE FACT INSTRUCTION

¶32. Humphrey proposed a lesser included murder instruction, D-6, and a proposed lesser included manslaughter instruction, D-7, which were denied by the trial court. Humphrey argued that the facts warranted these instructions. The trial court also denied Humphrey's proposed accessory after the fact instruction, and stated that the facts warranted such an instruction.

¶33. The standard of review for challenges to jury instructions is as follows:

Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present this theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

*Heidel v. State*, 587 So. 2d 835, 842 (Miss. 1991) (citations omitted).

Even though based on meager evidence and highly unlikely, a defendant is entitled to have every legal defense he asserts to be submitted as a factual issue for determination by the jury under proper instruction of the court. Where a defendant's proffered instruction has an evidentiary basis, properly states the law, and is the only instruction presenting his theory of the case, refusal to grant it constitutes reversible error.

*Hester v. State*, 602 So. 2d 869, 872 (Miss. 1992) (citations omitted).

¶34. The standard for determining whether an evidentiary basis exists is as follows:

Lessor included offense instruction should be granted unless the trial judge - and ultimately this court - can say, taking the evidence in the light most favorable to the accused, and considering all reasonable references which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lessor included offense (and conversely not guilty of at least one element of the principal charge).

*Harper v. State*, 478 So. 2d 1017, 1021 (Miss. 1985); *Brady v. State*, 722 So. 2d 151, 161 (Miss. Ct. App. 1998). If a rational or a reasonable jury could have found Humphrey not guilty of the principal offense charged in the indictment yet guilty of the lesser included offense, then the lesser included offense instruction should have been granted. *Evans v. State*, 725 So.2d 613, 664 (Miss. 1997).

¶35. Humphrey argues that the facts support a lesser-included offense of manslaughter instruction. The trial court refused such an instruction. The reason given by the trial court was that there was no basis in evidence to permit such an instruction in light of the defense of alibi chosen by Humphrey and that to grant instructions on alibi and lesser included offense instructions would be inconsistent and confusing to the jurors because it would necessarily require him to be on the scene and make some admission that he was there. The defense acknowledged that alibi was the defense to the State's indictment, and also acknowledged that it would be absolutely inconsistent with Humphrey's own defense. For the same reason the trial court denied the murder, as opposed to capital murder, jury instruction. Jury instructions will not be given unless there is an evidentiary basis for them. *Burns v. State*, 729 So.2d 203, 225 (Miss. 1998); *Blue v. State*, 674 So.2d 1184, 1201 (Miss. 1996). The State's evidence and the testimony of Humphrey provide no evidentiary basis whatsoever which would allow for the conclusion that Humphrey did not kill Mrs. Phillips while engaged in a burglary, or that the killing was in the heat of passion. Humphrey's own testimony was that he was not present during the burglary, did not commit any burglary, and did not kill Mrs. Phillips. Because there is no basis in the record to support such lesser included offense instructions, this assignment of error is without merit.

¶36. Humphrey also claims that the circuit court erred in not granting a requested instruction, D-4, which would have told the jury that it had the right to reject all or part of the testimony of any witness who had been impeached by a showing of prior inconsistent testimony or statements. Though the trial court expressed concern that this instruction might not be necessary and was a matter that would be better covered during the lawyer's argument, it appears that this instruction was ultimately "granted" according to the clerk's papers and the record and is therefore not an issue to be addressed by this Court.

¶37. The trial court also denied Humphrey's proposed accessory-after-the-fact jury instruction for the same reasons it denied the lesser instructions of murder and manslaughter, determining that no evidence had been presented during the trial which would allow the jury to consider this lesser offense. "An accessory after the fact is a person assisting one who has completed the commission of a felony to avoid being apprehended, arrested, convicted, etc." *Chase v. State*, 645 So.2d 829, 851 (Miss. 1994) (citations omitted). There is no evidence in the record that Humphrey assisted someone who had completed a felony, and the trial court correctly refused to grant such an instruction.

¶38. Taking the evidence in the light most favorable to the accused, there is no evidence in the record to support any of the proposed lesser included offense instructions. Thus the proposed instructions were devoid of any evidentiary foundation at all. Humphrey was not denied a fair trial and due process, and these assignments of error are therefore without merit.

### 7. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING MR. HUMPHREY'S MOTION TO EXCLUDE JURY CONSIDERATION OF THE DEATH PENALTY AFTER THE STATE RESTED ITS CASE IN CHIEF DUE TO INSUFFICIENT PROOF

¶39. Humphrey made a motion to exclude jury consideration of the death penalty because the State failed to establish that he had intended to kill Mrs. Phillips. The State asserts that this assignment of error is not properly before this Court in view of the fact that the jury did nor return a sentence of death against Humphrey. The asserts in the alternative that, even if the issue were properly before this Court the evidence was sufficient to satisfy the criteria established in *Enmund v. Florida*, 458 U.S. 782, 1102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (which have been codified in Miss. Code Ann. § 99-19-101(7) (1994). Where the jury is given an instruction which allegedly "invites" the death sentence, yet that instruction did not result in causing the jury to render such a verdict, the verdict will not be disturbed. *Gilliam v. State*, 186 Miss. 884, 192 So. 440 (1939). In this case the death sentence was more than invited, it was affirmatively requested, and the trial court correctly held a hearing outside of the presence of a jury to consider the *Enmund* factors pursuant to Miss. Code Ann. § 99-19-101 (1994) to determine whether the State had met these factors.

¶40. The *Enmund* factors to be considered are whether the jury makes a written finding of *one or more* of the following:

> (a) The defendant actually killed;
>
> (b) The defendant attempted to kill;
>
> (c) The defendant intended that a killing take place;
>
> (d) The defendant contemplated that lethal force would be employed.

Miss. Code Ann. § 99-19-101(7) (1994).

¶41. The jury heard testimony from Reggie Brooks that Humphrey told him "I've killed and I'll kill again." There was an evidentiary basis for the first *Enmund* factor for the jury to make the determination that Humphrey killed. The jury saw pictures of the victim and heard the testimony of the pathologist, showing extensive trauma, how she was tied up, and how her mouth was taped. This is an evidentiary basis from which the jury could conclude that the defendant could have intended that Mrs. Phillips be killed or that the defendant contemplated that lethal force would be employed. After considering all of these factors together the trial judge stated the following:

> And, again, the jury does not -- is not required to find all three of these Enmund factors. All the jury has to do is find that one or more of the Enmund factors existed. There's an evidentiary basis here for the jury to consider all three requirements of Enmund v. Florida and if there's sufficient evidence to undergird the jury's findings should they make it. I think the State has done what has been required to make a jury question out of the Enmund factors.

¶42. The State was only required to show one of the *Enmund* factors in order for the question of the death penalty to go before the jury. The standard of review for a sufficiency of the evidence claim requires this Court to view the evidence and all reasonable inferences which may be drawn in the light most consistent with the verdict. This Court has no authority to disturb the jury verdict short of a conclusion on our part that upon the evidence, taken in the light most favorable to the verdict, no rational trier of fact could have found the fact at issue beyond a reasonable doubt. *Ballenger v. State*, 667 So.2d 1242, 1259 (Miss. 1995). With the State's evidence taken as true, together with all reasonable inferences therefrom, the record does not suggest that the trial court was in error to allow the jury to consider the question of whether

Humphrey should face the death penalty, and the consideration of the death penalty by the jury did not impinge on Humphrey's right to a fair trial under the Eighth and Fourteenth Amendments of the U.S. Constitution.

### 8. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN OVERRULING MR. HUMPHREY'S OBJECTION TO A "FOR CAUSE" CHALLENGE

¶43. We have stated:

In order to strike a juror for cause there must be a clear showing that the prospective juror would be unable to follow the court's instructions and obey his oath; a juror's views alone do not constitute grounds for a challenge. A clear showing that a juror's views would prevent or significantly impair the performance of his duties requires more than a single response to an initial inquiry.

*Martin v. State*, 592 So.2d 987, 988 (Miss. 1991) (citation omitted).

¶44. During jury selection juror number 134, Bobby Gardner, indicated that she was the niece of Johnny Street, a witness who was to be called by both sides. She stated that although Johnny Street was her uncle, she did not know Helen Street, Eric Jones, Janice Jones, or Humphrey, all of whom were members of Johnny Street's family. The trial court granted a "for cause" challenge made against Bobby Gardner, Humphrey objected, and the trial court overruled the objection. The trial court stated that she was too "interwoven'" with Johnny Street who was a relative and a witness for both sides, and that there were sufficient other neutral jurors available who were not connected to the defendant, the witnesses, or to the State.

¶45. Humphrey contests that because the juror stated she could be impartial he was denied his constitutional right to a fair trial by a jury of his peers as guaranteed by the Sixth and Fourteenth amendments of the U.S. Constitution. Though the record is devoid of any express statement by Bobby Gardner that she could be impartial, when questioned whether the fact that she knew Johnny Street, and that he is Omar's stepfather, would cause her concern she replied that it would not. The question is thus whether the trial court was in error for allowing a for cause challenge against a juror who was to testify on both sides and was related to Humphrey as a "cousin by marriage" even though she did not actually know him or his immediate family members. This Court recently stated that the trial court has an affirmative duty to remove a juror for cause when they are related to a witness. *Fleming v. State*, 732 So.2d 172, 182 (Miss. 1999). Further, the statute dealing with for cause challenges, Miss. Code Ann. § 13-5-79 (1972) states the following:

Any person, otherwise competent, who will make oath that he is impartial in the case, shall be competent as a juror in any criminal case, notwithstanding the fact that he has an impression or an opinion as to the guilt or innocence of the accused, if it appear to the satisfaction of the court that he has no bias or feeling or prejudice in the case, and no desire to reach any result in it, except that to which the evidence may conduct. **Any juror shall be excluded, however, if the court be of opinion that he cannot try the case impartially, and the exclusion shall not be assignable for error.**

(emphasis added).

¶46. The trial court felt that because the juror was so "interwoven" with the defendant through kinship ties,

and the fact that her stepfather, who she did know, was going to be called as a witness during the case in chief that the for cause challenge should be sustained. Under the statute, and in light of case law pertaining to jurors who are related to witnesses, the trial court did not commit reversible error in granting the "for cause" challenge.

### 9. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING MR. HUMPHREY'S MOTION TO INTERROGATE REGINALD BROOKS AND DELORIS JEAN EPPS ON THE RESULTS OF POLYGRAPH TESTS BY A STATE POLYGRAPH EXAMINER

¶47. Despite having previously moved the trial court to exclude the "lie detector" tests, Humphrey made a motion in limine to use lie detector results against two of the State's key witnesses, Jean Epps and Reginald Brooks, for impeachment purposes. The trial court denied this motion. Humphrey concedes that the current law in Mississippi is that polygraph evidence is inadmissible. *Carr v. State*, 655 So.2d 824, 836 (Miss. 1995).

¶48. Humphrey cites several federal cases in support of his position that the polygraph evidence should have been admitted. However, these cases are predicated on the test for admissibility of "scientific" evidence applied in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This State has declined to adopt the *Daubert* test and continues to use the time-proven test set out in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). *See Gleeton v. State*, 716 So.2d 1083, 1086 (Miss. 1998). Recently this Court has stated "we find that testimony pertaining to a witness's offer to take a polygraph, whether it be a witness for the State or the defense, is not admissible at trial." *Weatherspoon v. State*, 732 So.2d 158, 162 (Miss. 1999). Moreover, this Court has also specifically addressed the issue of whether polygraph evidence is admissible to impeach the credibility of witnesses, and has held it is not. *Tavares v. State*, 725 So.2d 803, 811 (Miss. 1998). This assignment of error is therefore without merit.

### 10. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REINSTATING JURORS AGAINST WHOM MR. HUMPHREY ATTEMPTED TO EXERCISE PEREMPTORY CHALLENGES

¶49. In *Batson v. Kentucky*, 476 U.S. 79, 96, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) the U.S. Supreme Court set forth the following criteria whereby a defendant could establish a prima facie case of purposeful discrimination during jury selection, based solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.

> [He] is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice which permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that the facts and other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Walters v. State*, 720 So. 2d 856, 865 (Miss. 1998).

¶50. "The burden then shifts to the State to come forward with a race-neutral explanation for challenging the

jurors."*Mack v. State*, 650 So. 2d 1289, 1296 (Miss. 1994). Finally, the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory challenge. *Walters* at 865. "We accord great deference to the trial court in determining whether the offered explanation under the unique circumstances of the case is truly a race-neutral reason." "[A] trial judge's factual findings relative to a prosecutor's use of peremptory challenges on minority persons...will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence." *Stewart v. State*, 662 So. 2d 552, 558 (Miss. 1995). "This perspective is wholly consistent with our unflagging support of the trial court as the proper forum for resolution of factual controversies."*Id.*

¶51. During jury selection the prosecution made a *Batson* challenge to some of Humphrey's peremptory strikes. Humphrey asserts that the trial court was in error in requiring him to give race and gender neutral reasons for his peremptory challenges against jurors 13, 56, and 82, and that because no prima facie case of gender or race discrimination was established for his challenges, the trial court erred in requiring him to establish non-discriminatory reasons because no pattern of discrimination was established. Humphrey further asserts that as to these three jurors he did establish non-discriminatory reasons for his peremptory challenges. Humphrey is a black male.

¶52. The State exercised three peremptory challenges, against two white males and one white female. The defense asserted a gender discrimination claim and as a result the court instructed the State to show its reasons for the challenges, though it did not expressly find that the defense had made a prima facie case. The court found the reasons given by the State to be non-discriminatory. These actions by the trial court were not objected to by the defense and are not at issue on appeal. The defense then identified its peremptory challenges. After the defense had announced nine of its twelve challenges, the State asked the trial court to require Humphrey to defend the challenges on the basis of both gender and race. The record reveals the following circumstances surrounding this request:

> MR. WILLIAMS [the prosecutor]:
>
> Your Honor, inasmuch as there has been a challenge on the basis of gender and race to the State's challenges, we move the Court to do it also.
>
> THE COURT:
>
> All right. Give me the race gender neutral reason starting with ---
>
> MR. WALKER [Humphrey's attorney]:
>
> I'll be glad to, Your Honor.

¶53. At this point the court heard the reasons for the challenges. The peremptory strikes exercised by Humphrey against the nine jurors prior to the State's *Batson* challenge were against numbers 5 (white female), 11 (white male), 13 (white female), 16 (white male), 45 (white female), 56 (white male), 73 (white male), 82 (white female), and 89 (white male). The trial court allowed six of these challenges, finding them to be gender or racially neutral. The record does not reveal that the trial court explicitly found that the State had made a prima facie case under *Batson* and its progeny. However, this Court has emphasized that the question of whether "the totality of the relevant facts gives rise to an inference of discriminatory purpose" is a factually intensive inquiry which gives rise to a highly deferential standard of review. *Henley v. State*, 729

So.2d 232, 240 (Miss. 1998). Nothing in the record suggests that from the facts and relevant circumstances the trial court exceeded the bounds of its discretion in determining there was enough of a prima facie case for discrimination to permit the reverse *Batson* challenge against Humphrey's strikes against the nine white jurors. Once t he objecting party has made a prima facie showing that peremptory strikes are being exercised on the basis of race, the burden then shifts to the party exercising the strikes to offer a race neutral reason for the challenge. *Taylor v. State*, 733 So.2d 251, 257 (Miss. 1999).

¶54. The asserted reason for Humphrey's strike against juror 13 was that she failed to respond to a question asking if she believed life in prison without parole is worse than death. No other reason was offered. The trial court stated that no jurors were to be dismissed solely because of a lack of a response to a question and that, if no other reason was offered, she would be reinstated. It is worthy of note that none of the jurors responded to that particular question. This reason was not clearly erroneous or against the overwhelming weight of the evidence, and there was no error in reinstating juror 13.

¶55. A peremptory challenge was made by Humphrey against juror 56 (D-6). The reason offered for the challenge was that the juror had a slight hearing problem, and because he had knowledge of pre-trial publicity about the case. The trial court noted that the juror in question had not mentioned a hearing problem during voir dire. The juror had listed a "slight hearing problem" on the back of his questionnaire. With regard to the pre-trial publicity the court responded that the defense was not in the position to raise issues about pre-trial publicity when the night before Humphrey's attorney had granted an interview to the local television station. This case received widespread publicity, and many of the veniremen had read newspaper articles about it. The trial court found these reasons insufficient to justify a peremptory challenge and asked the defense if it had any other reasons. No other reasons were given, and the trial court denied the challenge and reinstated the juror. These reasons were not clearly erroneous or against the overwhelming weight of the evidence, and there was no error in reinstating juror 56.

¶56. Humphrey also made a peremptory challenge against juror 82 (D-8). The stated reasons for the strike were knowledge of pretrial publicity and that he also did not respond to the question about whether life in prison without parole is worse than death. Absent any other reasons advanced by the defense for the challenge, this juror was also reinstated. Again the reasons given for reinstatement do not appear clearly erroneous or against the overwhelming weight of the evidence. Absent any showing of clear error on the part of the trial court, or any showing that the reasons given by the trial court were against the overwhelming weight of the evidence, and in light of this Court's deference to the trial court as the proper forum for resolution of factual controversies, these assignments of error are without merit.

### 11. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING MR. HUMPHREY'S MOTION FOR A DIRECTED VERDICT AT THE COMPLETION OF THE STATE'S CASE IN CHIEF.

¶57. We have stated:

The standard of review for a motion for a directed verdict is as follows:

The standard of review in challenges to the sufficiency of the evidence is one in which all the evidence is considered in a light most favorable to the verdict. Collier v. State, 711 So.2d 458, 461 (Miss.1998). The credible evidence consistent with the guilt must be accepted as true, and the prosecution must be given the benefit of all favorable inferences which may be reasonably drawn from

the evidence. Collier v. State, 711 So.2d at 461 (quoting Wetz v. State, 503 So.2d 803, 808 (Miss.1987); Coleman v. State, 697 So.2d 777, 787 (Miss.1997)). Matters regarding the weight and credibility are to be resolved by the jury, and this Court may reverse only where the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty. Collier at 461. . . .

Williams v. State, No. 98-KA-00445-SCT, 1999 WL 695910 at *2 (Miss. Sept. 9, 1999).

¶58. Humphrey contends that the trial court erred in declining to grant him a directed verdict because the State failed to establish all of the elements of the crime of capital murder. Humphrey's assertion that the best case the State could have presented is manslaughter is without merit. The fact that Mrs. Phillips suffered a slow, lingering death rather than an immediate one does not turn capital murder into manslaughter. The trial court found that there was direct evidence placed before the jury that the event occurred in Tate County, allowing jurisdiction to attach; direct evidence of a forced entry into the Phillips residence, an essential element of burglary; direct evidence from witnesses Reed and Brooks placing the defendant at the scene; and corroborating evidence that a fingerprint of the defendant was found at the scene. Viewing such evidence before the jury in a light which gives the prosecution the benefit of all favorable inferences which may be reasonably drawn from the evidence, there is nothing in the record to indicate that reasonable and fair minded jurors could only reach a verdict of not guilty.

## 12. WHETHER THE JURY VERDICT OF CAPITAL MURDER WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE

¶59. "Only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal." Pleasant v. State, 701 So.2d 799, 802 (Miss. 1997) (citations omitted).

¶60. Nothing in the record supports Humphrey's contention that the verdict was so against the overwhelming weight of the evidence that to allow it to stand would constitute an unconscionable injustice. (See discussion of Humphrey's eleventh assignment of error regarding the evidence before the jury). Humphrey raises questions regarding the credibility of witness testimony, but it is well settled that issues of weight and credibility regarding witness testimony are to be resolved by the jury. Collier, 711 So.2d at 461.

## 13. WERE THERE SUFFICIENT CUMULATIVE ERRORS IN THIS CASE TO WARRANT REVERSAL

¶61. Because no errors have been found this assignment of error is without merit.

## CONCLUSION

¶62. For these reasons, we find no reversible error in the proceedings below. Therefore, the judgment of the Tate County Circuit Court is affirmed.

¶63. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT**

**WITHOUT PAROLE AFFIRMED.**

**SMITH, WALLER, COBB AND DIAZ, JJ., CONCUR. BANKS, J., CONCURS IN PART AND IN THE JUDGMENT WITH SEPARATE WRITTEN OPINION JOINED BY PRATHER, C.J., PITTMAN, P.J., AND McRAE, J.**

**BANKS, PRESIDING JUSTICE, CONCURRING IN PART AND IN THE JUDGMENT:**

¶64. While I agree with the result reached by the majority and most of what it says, I write separately to note my disagreement with its pronouncement concerning the propriety of the "send a message" argument in the sentencing phase of death penalty trials. I would not reverse the judgment here because the trial court sustained the objection to the argument and because Humphrey did not receive the death penalty. It is my view, however, that the deterrent effect of the death penalty is a legislative judgment and not a consideration for a jury in making the individualized decision whether the person before it should be put to death for the crime under consideration.

¶65. That the role of the jury is to weigh the evidence and to apply the law, not to "send a message," is a point that this Court has made clear.

> The jurors are representatives of the community in one sense, but they are not to vote in a representative capacity. Each juror is to apply the law to the evidence and vote accordingly. The issue which each juror must resolve is not whether or not he or she wishes to "send a message" but whether or not he or she believes that the evidence showed the defendant to be guilty of the crime charged. The jury is an arm of the State but is not an arm of the prosecution. The State includes both the prosecution and the accused. The function of the jury is to weigh the evidence and determine the facts. When the prosecution wishes to send a message they should employ Western Union. Mississippi jurors are not messenger boys.

*Williams v. State*, 522 So.2d 201, 209 (Miss. 1988).

¶66. The Court of Appeals, taking notice of the fact that prosecutors have not heeded the numerous warnings from the appellate courts of this state, stated that in the future such "send a message" arguments would be considered per se reversible error if properly objected to at trial. *Alexander v. State*, 736 So.2d 1058, 1064 (Miss. Ct. App. 1999). This Court tempered the holding in *Alexander* by adopting Judge Southwick's concurring opinion, *Id.*, at 1065, and declined to adopt a per se reversible error rule. However, the use of a send a message type argument may, depending on the surrounding circumstances, constitute reversible error on its own. *Payton v. State*, No. 96-CT-00949-SCT, 1999 WL 649652 (Miss. Aug. 26, 1999) (motion for rehearing pending). This Court has again and again warned prosecutors against the use of "send a message" type arguments both in a literal and an implied way, and such an argument may, depending on the surrounding circumstances, constitute reversible error. However, this Court has stopped short of establishing a per se reversible error rule for "send a message" terminology. *Id.*

¶67. In this case, the send-a-message type argument occurred during the sentencing phase of the bifurcated trial, after the determination of guilt had been made by the jury, and during consideration of the death penalty. Prosecutors have up until this point been granted some leeway during the sentencing phase of a trial. Where the purpose of the statement is to help determine whether the death penalty should be imposed, the prosecution has been permitted to argue that the "message" conveyed by the death penalty verdict

would be different than that of a lesser sentence. *See* *Wells v. State*, 698 So.2d 497, 513 (Miss. 1997) (declining to declare a send-a-message argument during the sentencing phase to be reversible error).

¶68. It is inconsistent, however, for this Court to condemn roundly "send a message" type arguments during the first phase of a bifurcated trial, yet tolerate them during the sentencing phase. Whatever may be the considerations of a sentencing judge in an ordinary case, the role of the jury in the sentencing phase of a death penalty case is not to send an anti-crime message to the community at large, but to weigh aggravating and mitigating circumstances in order to determine whether the defendant should receive the death penalty or a life sentence. *Wells* and its progeny are, to the extent that they do not prohibit "send a message" type arguments in the sentencing phase of capital murder cases, simply wrong.

¶69. The standard of review in cases where the defendant is exposed to the death penalty is as follows:

> On appeal to this Court convictions of capital murder and sentences of death must be subjected to what has been labeled 'heightened scrutiny.' Under this method of review, all bona fide doubts are to be resolved in favor of the accused because 'what may be harmless error in a case with less at stake becomes reversible error when the penalty is death.'

*Balfour v. State*, 598 So.2d 731, 739 (Miss. 1992) (citations omitted).

¶70. By improperly urging a jury to sentence a person to death in order to make an example of them the prosecutor goes well beyond harmless error. The purpose of the statutory scheme in capital murder cases is to require the jury to weigh the aggravating and mitigating circumstances to decide whether the death penalty or a life sentence would be more appropriate. *See* Miss. Code Ann. §  99-19-104 (1994). The statute provides that the following shall be considered:

**(5) Aggravating circumstances shall be limited to the following**:

(a) The capital offense was committed by a person under sentence of imprisonment.

(b) The defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person.

(c) The defendant knowingly created a great risk of death to many persons.

(d) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, aircraft piracy, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, Mississippi Code of 1972, or the unlawful use or detonation of a bomb or explosive device.

(e) The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

(f) The capital offense was committed for pecuniary gain.

(g) The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.

(h) The capital offense was especially heinous, atrocious or cruel.

**(6) Mitigating circumstances shall be the following**:

(a) The defendant has no significant history of prior criminal activity.

(b) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(c) The victim was a participant in the defendant's conduct or consented to the act.

(d) The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor.

(e) The defendant acted under extreme duress or under the substantial domination of another person.

(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(g) The age of the defendant at the time of the crime.

Miss. Code Ann. § 99-19-101 (1994) (emphasis added).

¶71. It is clear that the Legislature went to considerable lengths in defining and limiting those factors to be considered when contemplating sentencing a defendant to death. Nothing in this statutory scheme either explicitly or impliedly suggests that the issue of supposed "deterrence" or "sending a message" to the community is a factor to be considered. Indeed, consideration of this factor would fly in the face of the uniform death determination that the statutory scheme was designed to achieve. What a particular jury may consider to be a community problem in need of a message may vary greatly depending upon the time and place of the occurrence. It may have little to do with the comparative nature of the crime or the individual characteristics of the defendant. It is entirely inappropriate and inconsistent with our statutory scheme, then, for jurors to consider sending a message to the community at-large as one of the factors to be considered during sentencing in a capital murder case.

¶72. As the Florida Supreme Court put it this argument is "an obvious appeal to the emotions and fears of jurors" and is "outside the scope of the jury's deliberation and [its] injection violates the prosecutor's duty to seek justice, not merely "win" a death [verdict]." *Bertolotti v. State*, 476 So. 2d 130, 133 (Fla. 1985) (citing, ABA Standards for Criminal Justice 3-5.8 (1980)); *see also Campbell v. State*, 679 So. 2d 720 (Fla. 1996)(reversing a death verdict for reasons including an impermissible "message to the community" argument).

¶73. The New Jersey Supreme Court has also addressed this issue and reversed a death sentence based upon the use of the "send a message" argument:

By urging the jury to sentence defendant to death in order to deter him from future acts of violence and to "send a message" to society that conduct such as defendant's will result in the death penalty, the prosecutor's arguments focused the jury's attention on matters extraneous to the aggravating and mitigating factors established by the Legislature to channel the jury's deliberations in the penalty phase

of a capital case. Neither the likelihood that defendant would commit future crimes nor the benefit to society from sentencing to death persons convicted of capital murders is among the aggravating factors set forth in the Act. The emotional force of the prosecutor's arguments posed a significant risk that the jury would be diverted from its duty to determine defendant's punishment based on the evidence and in accordance with the trial court's charge. We conclude that these statements were improper and prejudiced defendant's penalty-phase proceeding.

*State v. Rose*, 112 N.J. 454, 520, 548 A.2d 1058,1092 (1988).

¶74. I agree. I believe that it is wrong to confuse a legislative judgment with the death deciding task of a jury. Moreover, of pragmatic concern, we should note that the United States Supreme Court has yet to address the issue. Prosecutors in this State would do well to eschew this argument lest we find once again an infection in death verdicts akin to the failure to define properly the heinous, atrocious or cruel factor. *See Clemons v. Mississippi*, 494 U.S. 738, 751, 110 S.Ct. 1441, 1449, 108 L.Ed. 2d 725 (1990), and its progeny.

**PRATHER, C.J., PITTMAN, P.J., AND McRAE, J., JOIN THIS OPINION.**

1. It should be noted that while prejudice is considered here in the context of a *constitutional* speedy trial challenge, it would not be necessary to establish prejudice to the defendant under the statutory 270 day rule.