# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-KA-00726-SCT

*CALVIN GIBSON a/k/a FERNANDIS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/16/2024 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS-BLACKMON |
| TRIAL COURT ATTORNEYS: | AKILLIE MALONE OLIVER |
| | DANA HELENE EVANS |
| | BRANDI LINDSAY BROWN |
| | LARRY STAMPS |
| | ALVA PEYTON TAYLOR |
| | DARLA Y. MANNERY-PALMER |
| | ANITA M. STAMPS |
| | LARRY GUS BAKER |
| COURT FROM WHICH APPEALED: | HOLMES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | LARRY STAMPS |
| | ANITA M. STAMPS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PARKER ALAN PROCTOR, JR. |
| DISTRICT ATTORNEY: | AKILLIE MALONE OLIVER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 06/25/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Calvin Gibson appeals his convictions of capital murder and armed robbery. He argues that his right to a speedy trial was violated, that the State presented insufficient evidence to support his convictions, that the trial court erred by allowing hearsay testimony, and that he was denied his right to a fair trial due to prosecutorial misconduct. We find that

the trial court failed to conduct a proper speedy-trial hearing. During the hearing, the trial court erred by taking judicial notice of a backlog in the medical examiner's office without requiring the State to provide evidence that the backlog was the cause of the more-than-four-year delay between Gibson's arrest and his indictment. Therefore, we remand this issue to the trial court to conduct a proper analysis under ***Barker v. Wingo***, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).[1] Further, because the trial court erred by allowing large amounts of hearsay testimony, because the State misrepresented evidence during closing arguments, and because the State used improper impeachment evidence as substantive evidence, we reverse Gibson's convictions and remand this case for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶2.     Early Wednesday morning, February 14, 2018, Brandon Cooper was found deceased on the back steps of his home in Lexington, Mississippi. Gibson was arrested on February 17, 2018, and was released on bond on April 9, 2018.

¶3.     On June 24, 2022, a Holmes County grand jury indicted Gibson, Andrakious Johnson, and Dwrone Brown on charges of capital murder and armed robbery. Gibson was arraigned on August 15, 2022. On September 22, 2022, Gibson filed a motion to dismiss for lack of a speedy trial. After a hearing on the matter, the trial court denied Gibson's motion to dismiss,

---

[1]"[T]he sole remedy for denial of a defendant's right to a speedy trial is dismissal of the charges against him." ***Smith v. State***, 550 So. 2d 406, 409 (Miss. 1989) (citing ***Perry v. State***, 419 So. 2d 194, 197 (Miss. 1982)). Therefore, on remand, if the State fails to show good cause for the delay, "the indictment against [Gibson] must be dismissed, and he must be finally discharged." ***Barnes v. State***, 577 So. 2d 840, 844 (Miss. 1991).

taking judicial notice of a backlog in the medical examiner's office.

¶4.	Johnson and Brown each accepted plea bargains. Gibson's trial began on February 12, 2024. Frank Howard testified that he previously had been a "bootlegger." He stated that on the night of February 13, 2018, a man had arrived at his house and had asked for change for a $100 bill. After Howard informed the man that he did not have change, the man inquired about liquor and then walked away. Howard stated that he had noticed a rifle in the man's possession. He had not seen the man's face, however, because it had been too dark that night.

¶5.	Brown, who was eighteen years old in 2018, testified that Johnson was his best friend. He stated that on the night of February 13, 2018, Johnson had picked him up from a wash house in the Lexington area. Johnson then picked up Gibson from Taneka Thomas's house.[2] Brown testified that Gibson had been wearing a hoodie and jeans that night.

¶6.	According to Brown, the three men rode around before deciding to go to Howard's house to attempt to get change for a counterfeit $100 bill. Brown testified that he had walked to Howard's door and had attempted to buy liquor from Howard. At some point, however, his 12-gauge shotgun had fallen out of his jumpsuit. Brown picked up his gun and went back to the car.

¶7.	Later that night, Brown announced to Johnson and Gibson that he was going to try to rob somebody. Brown testified that both Johnson and Gibson were in agreement with his plan. The group saw Grant Genous Jr. drive by, and Johnson suggested that he try to buy

---

[2]Thomas was Brown's aunt who had been dating Gibson at that time.

marijuana from Genous with the counterfeit $100 bill. So the group followed Genous to Brandon's house, where Genous had parked outside. Brown testified that his plan was to buy a small amount of marijuana from Genous and to give Genous the counterfeit $100 bill to get change back. Brown exited Johnson's car and began talking to Brandon and Genous, who were sitting in Genous's car. Johnson and Gibson had remained in Johnson's car. Brown attempted to buy marijuana from Genous, but Genous gave Brown a marijuana blunt for free instead. Brown walked to Johnson's car to hand the marijuana to Johnson and then walked back to Genous's car to continue his conversation. Brown testified that while he was talking to Genous and Brandon, he looked up and saw Gibson walk behind him with a mask on. Brown asserted that Gibson had approached Genous's driver's side window and had pointed a gun at Genous's head. Genous then grabbed the gun, and the gun fired.

¶8.    At that point, Brown ran back to Johnson's car while Genous exited his vehicle and began shooting at Gibson. Brown stated that he fired his shotgun three times in the air in an attempt to scare Genous and Brandon. After Genous drove off, Johnson dropped Brown off at his home. Brown testified that it had not been the plan to shoot anybody and that he had not known that Gibson was going to shoot anybody. He also had not immediately realized that Brandon had been shot. Brown testified that he found out that Brandon had been shot later that day.

¶9.    After Brown learned that Brandon had been shot, he voluntarily arrived at the police station on February 14, 2018. He admitted that he had initially lied to the Mississippi Bureau

4

of Investigation (MBI) agents about who had been involved in the shooting. Brown had informed agents that same night in a subsequent interview, however, that Johnson, Gibson, and he had been present during the shooting and that Gibson had been the one who had pointed a gun at Genous. Brown also admitted that he had pleaded guilty to a lesser charge and that the plea deal had influenced his decision to testify against Gibson.

¶10.    Johnson, who was twenty years old in 2018, testified that Gibson was his cousin.[3] Johnson corroborated Brown's testimony and stated that he had picked up Brown and Gibson the night of February 13, 2018, and that Gibson had been wearing a hoodie that night. Johnson stated that the group had seen Genous and had decided "to pull-up on Genous to get something to smoke." When they pulled up to Genous's car, Brandon had been sitting in the front passenger seat. Johnson maintained that, while Brown was conversing with Genous, Gibson got out of his car, went to the driver's side window of Genous's car, and shot inside the car. He stated that Genous began shooting back at Gibson and that Brown had fired his shotgun. Johnson testified that he had not possessed a weapon that night.

¶11.    Like Brown, Johnson testified that he had not known that Brandon had been shot until later that morning when he saw a post about Brandon's death on Facebook. Johnson turned himself in later that day, on February 14, 2018. Johnson also admitted that he had taken a guilty plea in hopes that he would receive a lighter sentence. He stated, however, that he had informed police that Gibson was the shooter on February 14, 2018, and that he had not been

---

[3]Johnson also referred to Gibson as "Fernand[i]s."

offered a plea until 2023.

¶12.    Genous, also referred to as "D-low," testified that on the night of February 13, 2018, at approximately 11:45 p.m., he had been at a store and had "bumped into Brandon[,]" with whom he had been friends for more than ten years. Brandon and Genous had made plans that night to "[s]moke a little weed and hang out and play video games . . . ." Thereafter, Brandon went home. Genous arrived at Brandon's house shortly afterward and text messaged Brandon to let him know that he was outside. Genous testified that he had waited outside for approximately ten or fifteen minutes when a gold Buick approached him. The car pulled up directly beside Genous, and Genous had recognized Johnson, who was driving, and Brown. Johnson and Brown asked Genous if he had change for a $100 bill. Genous told them that he did not have change, and the two then drove away.

¶13.    Genous testified that he felt like something was not right and that the men had been "up to something." According to Genous, the same gold Buick had approached him for a second time, as Brandon was walking out of his house, and had parked in front of Genous's car. Genous stated that Brown got out of the Buick and began talking to Brandon through the driver's side window as Brandon sat down in the passenger seat of Genous's car. Genous testified that while the two were conversing, he had "notice[d] a guy get out of the back of the [gold Buick] with a hood on and you know covered up[.]" He stated that the man was wearing a hoodie that was a dark color, either navy blue or black.

¶14.    Genous testified that the man in the hoodie walked up to his car and told him to "shut

6

up." The man then tried to hit Genous with a gun, and the gun fired. Genous testified that he heard Brandon yell, "D-low[,]" and that Brandon had jumped out of the car. Genous also exited his car and began shooting back. When Genous realized he did not have any bullets left, he ran back to his car and drove away. Genous heard shots being fired behind him as he drove away. Genous had not known where Brandon was after the shooting and had not seen in which direction he had run. Genous went home and called and text messaged Brandon several times, but Brandon had not answered his phone. Genous testified that he thought that he had first called Brandon after the shooting at approximately 12:30 a.m. or 12:40 a.m. Genous had not realized at that time that Brandon had been shot. Genous stated that he had not seen Johnson or Brown fire a weapon.

¶15. Genous met with MBI agents on February 14, 2018. In Genous's statement from that day, he had estimated to the agents that the shooting had occurred around 1:00 a.m. to 1:20 a.m. but stated that he was not sure that timing was accurate. Genous testified that he had turned his weapon, a .380 Bodyguard, over to MBI agents.

¶16. Clementine Cooper, Brandon's mother, testified that in 2018, Brandon's normal schedule was to work the 3:00 p.m. to 11:00 p.m. shift and that he would generally arrive home before midnight. She stated that Brandon had worked his normal shift on February 13, 2018, and had arrived home that night before midnight. Clementine testified that she had seen Brandon when he had arrived home because he had forgotten his keys that night and she had opened the door for him when he had arrived.

7

¶17. Early the next morning, around 3:00 a.m., Clementine received a call from Alexis Alexander, Brandon's girlfriend at the time, who had expressed her concern that Brandon was not answering his phone. Clementine stated that she went upstairs to check on Brandon but saw that he was not in his room. Alexander asked Clementine if she could come over to the house to pick something up that she needed for work, and Clementine agreed. She testified that she then went back to her room and lay back down.

¶18. Shortly afterward, Clementine heard "someone banging at the door." When she answered the door, she saw Alexander and also observed Brandon "laying down across the back steps." She testified that she touched Brandon and that he felt cold and did not move; therefore, she called 911. Clementine testified that her oldest son, Raymond Jackson, began cardiopulmonary resuscitation (CPR) until the medics arrived. Brandon was pronounced dead at her home.

¶19. Gibson, who was twenty-nine years old in 2018, lived with Thomas at that time. He testified that the night of February 13, 2018, he was watching the couple's five children at home while she worked.[4] Thomas returned to the house around 10:00 p.m. Gibson testified that, after Thomas returned home, Brown and Johnson showed up at the house. Brown began talking to Thomas and informed Gibson that his cousin was outside. Gibson walked outside and observed Johnson with a couple of guys in his car. According to Gibson, Johnson asked

---

[4]Gibson and Thomas shared two children together, and Thomas had three additional children.

Gibson if he could borrow his car. Gibson told Johnson that he could not borrow his car and testified that Johnson had "got[ten] a little attitude" and had left after approximately ten or fifteen minutes. He testified that after Johnson and Brown had left, he went back into the house and sat on the couch for a little while. He then asked Thomas to fix him a sandwich. Gibson stated that after she made him a sandwich, he went to bed at approximately 1:00 a.m. He testified that he had not left Thomas's house between the hours of 10:30 p.m. and 1:00 a.m.[5]

¶20.     Gibson asserted that he had learned of Brandon's death on February 14, 2018, but that the news had not "stuck to" him because he was not close with Brandon. The police had arrived at Gibson's house a few days later, and he testified that, at that point, he realized the police were looking for him. Therefore, he turned himself in. Gibson stated that he had never owned a firearm and had not possessed one the night of February 13, 2018.

¶21.     Dr. Mark LeVaughn, the former chief medical examiner at the Mississippi Department of Public Safety, testified that Brandon had suffered a single gunshot wound to his left shoulder that entered his left arm, exited the arm, and reentered the left side of his chest. The bullet had injured Brandon's left lung and aorta and was the cause of Brandon's death. Dr. LeVaughn testified that the shooter would have been located on Brandon's left side and that his injuries were consistent with Brandon sitting in a passenger seat in a vehicle and the

_____

[5]On cross-examination, Gibson stated that he would not disagree that his and Thomas's house was approximately six to twelve minutes from Brandon's address.

9

shooter being outside the driver's side window, shooting into the vehicle. According to Dr. LeVaughn, the coroner listed Brandon's time of death as 12:45 a.m. on February 14, 2018.

¶22. Agent Josh Dority, a special agent with the MBI, testified that he had accessed Brandon's phone records and that the records had shown an incoming call from Genous at 12:42 a.m. on February 14, 2018. Genous called Brandon again at 12:53 a.m. and at 1:19 a.m. Genous also text messaged Brandon at 1:22 a.m. The text message at 1:22 a.m. stated:

> Trying to see if you good bruh glad I had mine man we would have been f***** up man I felt like someone's going to go on man could I had came through once before when I was waiting on you to come out the house but she it man I was just checking on you man my bad about that man but I ain't my fault your man . . . hey man but we'll see about that I talk to you man hope you all right.

¶23. Tommy Bishop, a forensic scientist at Mississippi Forensics Laboratory, testified that he had examined two firearms, four cartridge casings, and one bullet relating to Brandon's death. The two firearms were a Smith & Wesson Bodyguard .380, which was Genous's weapon, and a Smith & Wesson .38 caliber revolver. Bishop compared both guns to the evidence submitted. Bishop was able to match three of the cartridge casings to the Bodyguard .380. Bishop was able to eliminate the remaining cartridge casing from the .38 caliber revolver. The bullet that was examined was a .38 caliber bullet that had been recovered from Brandon's autopsy. Bishop testified that the bullet was eliminated from both guns that he had examined.

¶24. On February 16, 2018, Thomas gave a statement to Agent Mark Steed and to Officer John Newton with the Lexington Police Department. Thomas passed away on June 13, 2020,

10

however. The following portion of Thomas's statement was admitted into evidence:

Steed: All right. So [what] happened on Tuesday the 13th. Okay.

Thomas: I got off work, it was probably almost 10:00. And so when I made it in and I got the kids, I put them to bed and he was in the room. He was on his phone and somebody said that they just wanted to come out to the house. And so when they came out to the house, he went outside and, you know, he stayed in the car, you know, and he was talking—it was his little cousin, Drakey, and it was my nephew.

Steed: Drake?

Thomas: Drake.

Steed: Drake who?

Thomas: Johnson. It was him and it was my cousin—I mean, my nephew. His name DD. I don't know DD real name, but his name DD. That's my nephew that's my brother's son.

Steed: What's his last name?

Thomas: Talking about DD? I don't know his last name.

Steed: Brown?

TT: Yeah, that's his name, Dwrone Brown. Dwrone Brown. That's his name. He came in the house and he was, you know, he's talking to me about a situation he had going on or whatever. And I was talking to him. It was some more guys and I don't know who all was in the car with him, but I just know it was just a car load of guys. And so about 10:30, 11:00, if Calvin left my house, he left my house about 10:30, 11:00 and he left when I was in the tub. But I don't know for sure that he left, but I'm saying if he did leave, it was between 10:30 and 11:00 'cause that's the only time that, you know, I was in the shower so I couldn't say that the car was there between 10:30 and 11:00. But after I got out the tub, I didn't know for sure that, you know, they was in the yard. They was sitting in the yard. You know,

11

they was drinking, you know, what guys do. And about 1:00 something, he came in the house and he went to bed. He did not leave my house that night that I know of. That's why I said if he left, he left between 10:30 and 11:00 when I was in the tub 'cause I was looking, 'cause, you know, I know him because he cheats so I was watching, you know, to make sure that he wasn't trying to leave and go off and do anything.

Steed:     Do y'all normally sleep in the same bed at night?

Thomas:     We do. We sleep in the same room.

Steed:     Was he in the bed when you went to bed?

Thomas:     Yeah.

            . . . .

Thomas:     . . . I didn't know that y'all was looking for him saying that he did the killing. I'm like "When he left home? He did not leave home that night," that I know of. Like I said, if it was, it was like 10:30 and 11:00 when I was in the shower, but after that, he didn't leave home.

¶25.   The jury found Gibson guilty of capital murder and armed robbery. The trial court sentenced Gibson to life without parole. Gibson now appeals.

## ISSUES

1.   Whether the trial court erred by denying Gibson's motion to dismiss for lack of a speedy trial.

2.   Whether the evidence was insufficient to support the verdict and whether the verdict was against the overwhelming weight of the evidence.

3.   Whether the trial court erred by allowing inadmissible hearsay evidence.

12

4.      Whether Gibson was denied his right to a fair trial due to prosecutorial misconduct.

Because the remaining issues are dispositive, we decline to address the issue of whether the evidence was insufficient to support the verdict and whether the verdict was against the overwhelming weight of the evidence.

## ANALYSIS

## I.      Whether the trial court erred by denying Gibson's motion to dismiss for lack of a speedy trial.

¶26.    More than 1,682 days elapsed between Gibson's arrest and the date of his speedy-trial hearing; therefore, he asserts that his right to a speedy trial was violated. The Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI.; *see also* Miss. Const. art. 3, § 26. "The history of the right to a speedy trial and its reception in this country clearly establish that it is one of the most basic rights preserved by our Constitution." *Klopfer v. North Carolina*, 386 U.S. 213, 226, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967). The *Klopfer* Court recognized that

> the right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment. That right has its roots at the very foundation of our English law heritage. Its first articulation in modern jurisprudence appears to have been made in Magna Carta (1215), wherein it was written, "We will sell to no man, we will not deny or defer to any man either justice or right"; but evidence of recognition of the right to speedy justice in even earlier times is found in the Assize of Clarendon (1166).

*Id.* (first quoting Magna Carta, c. 29 (c. 40 of King John's Charter of 1215) (1225), translated

13

and quoted in Coke, *The Second Part of the Institutes of the Laws of England* 45 (Brooke, 5th ed., 1797); then citing 2 *English Historical Documents* 408 (1953)).

¶27.    "[T]he constitutional right to a speedy trial attaches at the time of arrest rather than arraignment." ***Sharp v. State***, 786 So. 2d 372, 380 (Miss. 2001) (citing ***Humphrey v. State***, 759 So. 2d 368, 375 (Miss. 2000), *superseded by rule as stated in* ***Miss. Transp. Comm'n v. McLemore***, 759 So. 2d 368 (2003); ***De La Beckwith v. State***, 707 So. 2d 547, 565 (Miss. 1997)). To determine whether the right to a speedy trial has been violated, "courts must balance: (1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) whether the defendant was prejudiced by the delay." ***Jenkins v. State***, 947 So. 2d 270, 276 (Miss. 2006) (citing ***Barker***, 407 U.S. at 530).

### A.    Length of the Delay

¶28.    "[A] delay in excess of eight months between arrest and trial establishes 'presumptive prejudice' sufficient to trigger analysis under ***Barker***." ***Sharp***, 786 So. 2d at 380 (internal quotation marks omitted) (quoting ***Skaggs v. State***, 676 So. 2d 897, 900 (Miss. 1996)). The ***Barker*** Court noted that a five-year delay between arrest and trial "was extraordinary." ***Barker***, 407 U.S. at 533. Gibson was arrested on February 17, 2018. At the time of his speedy-trial hearing on September 26, 2022, more than four years and seven months had passed since the date of his arrest. Therefore, a delay of 1,682 days is significant and creates a presumption of prejudice. The presumption of prejudice is not determinative, however. "Presumptive prejudice 'simply marks the point' where the court must then consider the

14

remaining ***Barker*** factors, and the burden is shifted to the State to show good reason for delay." ***Galloway v. State***, 122 So. 3d 614, 650 (Miss. 2013) (quoting ***Johnson v. State***, 68 So. 3d 1239, 1242 (Miss. 2011)). But this factor weighs in favor of Gibson.

### B.     Reason for the Delay

¶29.    The State claimed that the delay was due to a "severe backlog" at the medical examiner's office. According to the State, although Brandon's autopsy was performed on February 16, 2018, it had not received the final autopsy report until February 14, 2022. Contained in the record is the autopsy report, which indicates that Brandon's autopsy was performed on February 16, 2018. Yet Dr. LeVaughn had not signed the autopsy report until February 14, 2022. The State pointed out that the next available grand jury date after it had received the autopsy report had been in June 2022, which was when Gibson had been indicted.

¶30.    Defense counsel argued that the State had merely claimed that there was a backlog at the medical examiner's office but had failed to explain why it took four years for the autopsy report to be certified. He contended that the State should have explained what happened in each year to contribute to the four-year delay in certifying the autopsy report.

¶31.    The trial court took judicial notice that there had been "problems in the crime lab of the State of Mississippi as far as doing the autopsy reports." It concluded that the crime-lab delay was out of the control of the State and that the State had shown good cause for the delay.

15

¶32.    We find that it was improper for the trial court to take judicial notice of a backlog in the medical examiner's office. Mississippi Rule of Evidence 201 governs judicial notice of an adjudicative fact and states that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: **(1)** is generally known within the trial court's territorial jurisdiction; or **(2)** can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." MRE 201(b). Although the existence of a backlog in the medical examiner's office might have been generally known, that the backlog was severe enough to cause the extraordinary delay in this particular case was not.

¶33.    The State merely argued that the medical examiner's office had been backlogged. It neither presented testimony regarding whether the backlog solely caused the substantial delay in certifying the autopsy report in this specific case, nor did it explain why the medical examiner's office was so backlogged that it took more than four years to certify an autopsy report. The State also failed to present evidence that it had performed its due diligence in pursuing the certification of the autopsy report. This Court has stated that "[r]eview of a speedy trial claim encompasses a fact question of whether the trial delay rose from good cause. Under this Court's standard of review, this Court will uphold a decision based on *substantial*, credible evidence." *Myers v. State*, 145 So. 3d 1143, 1151 (Miss. 2014) (emphasis added) (quoting *DeLoach v. State*, 722 So. 2d 512, 513 (Miss. 1998)).

¶34.    It is well-established that "[a] deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government." *State v. Magnusen*, 646 So.

16

2d 1275, 1281 (Miss. 1994) (quoting *Barker*, 407 U.S. at 531). But "[*a*] *more neutral reason such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.*" *Id.* (quoting *Barker*, 407 U.S. at 531).

¶35. This Court in *Galloway* determined that a 424-day delay between the defendant's arrest and the date of his first trial setting had not violated his right to a speedy trial. *Galloway*, 122 So. 3d at 650. The State claimed that it had needed time to get evidence analyzed by the crime lab and by its expert witness. *Id.* Yet this Court noted that "the State failed to provide any documentation or facts of actual delays in obtaining testing results from the Louisiana crime lab. We do not know when the State submitted its evidence to the lab for testing or when the State received the results." *Id.* It emphasized "the importance of making a clear record to allow proper review of speedy-trial claims." *Id.* (citing *Flora v. State*, 925 So. 2d 797, 817 (Miss. 2006)).

¶36. In *Flora*, this Court "urge[d] the trial courts and prosecutors of this State to guard against becoming complacent with regard to making a clear record to allow proper review of speedy trial claims." *Flora*, 925 So. 2d at 817. It stated that "[t]his Court should not be expected to simply accept at face value the claims of crowded dockets, backlogged laboratory testing, and other similar logistical problems . . . ." *Id.*

¶37. Moreover, "[t]his Court has held that 'without more *specific* evidence explaining the reasons for the delay in [the] trial, we cannot accurately determine the ultimate factual

question of whether good cause existed for the delay in this case." ***Ward v. State***, 346 So. 3d 868, 872 (Miss. 2022) (second alteration in original) (quoting ***Myers***, 145 So. 3d at 1152).

¶38.    For example, in ***Jenkins***, during a hearing on the defendant's motion to dismiss for violation of the right to a speedy trial, the State provided witnesses from "the police, the state crime lab, and the district attorney's office, all of whom testified to the delays caused by the crime lab's personnel shortages and backlog of requests." ***Jenkins***, 947 So. 2d at 276. Thus, this Court found that the defendant's right to a speedy trial was not violated and that the trial court's decision was "supported by substantial, credible evidence of good cause." ***Id.***

¶39.    In ***McGee v. State***, the trial court denied a motion to dismiss for a speedy-trial violation, reasoning that

> One, in the past five years the number of indictments and cases coming before this Court for disposal have greatly increased, most of them—most of the increase being in dealing directly with drug offenses. For example, the Court remembers one term, I believe it was last year, where out of sixty indictments, thirty-nine of them were for illicit drug dealings.
>
> Two, there simply does not exist enough days during term of this Court to deal with the large number of cases that this Court must dispose of in the allotted time.
>
> Three, the availability of drug analysts to testify is severely restricted and there appears in this case at least one continuance for this very reason.
>
> Next, number four, there a growing problem with getting the results of drug analyses of the Mississippi State Crime Lab because of the overload of cases that they have to handle, and sometimes as long as a year elapses before the analysis is ready.
>
> The Court, therefore, finds that it was not physically and humanly possible for the cases to be brought forward and tried within the two hundred and seventy

18

days and that it is through no fault nor neglect of the State's attorney that this case has been delayed; therefore, the motion will be denied.

*McGee v. State*, 608 So. 2d 1129, 1132-33 (Miss. 1992). This Court, however, held that "[t]he trial court's conclusions, while perhaps valid from an administrative standpoint, are general and contain no specific findings regarding the instant case *per se*." *Id.* at 1133. Further, "[g]iven that the Holmes County Circuit Court system and the State Crime Lab are overwhelmed with drug cases, the State nevertheless bears the burden of positively demonstrating that the backlog actually caused the delay in this particular case." *Id.* (citing *Williamson v. State*, 512 So. 2d 868, 876-77 (Miss. 1987); *Nations v. State*, 481 So. 2d 760, 761 (Miss. 1985)).

¶40.    Similarly, here, the trial court exceeded its authority by taking judicial notice that there was a backlog in the medical examiner's office without requiring the State to demonstrate that the backlog had actually caused the delay in this particular case; therefore, substantial evidence of good cause was not presented.

> Thus, in cases such as this, in which the defendant asserts his speedy trial right but the trial court has not held an adequate hearing on the issue, this Court has two options: (1) decide the case based on a *de novo* review of the record before us, if good cause for the delay is apparent, or (2) remand the case to the circuit court to allow the State to present evidence explaining the delay and to conduct a proper *Barker* analysis.

*Rowsey v. State*, 188 So. 3d 486, 493 (Miss. 2015) (citing *Myers*, 145 So. 3d at 1151-52). Because the trial court exceeded its authority by taking judicial notice of a backlog in the medical examiner's office without requiring the State to present evidence that the backlog

19

was severe enough to cause more than four years to elapse between the performance of the autopsy and the certification of the autopsy report, we find that the trial court failed to conduct a proper ***Barker*** hearing.

### C. Assertion of Right

¶41. Gibson did not assert his right to a speedy trial before filing his motion to dismiss for lack of a speedy trial on September 22, 2022. Yet "[a] defendant has no duty to bring himself to trial[.]" ***Barker***, 407 U.S. at 527 (citing ***Dickey v. Florida***, 398 U.S. 30, 37-38, 90 S. Ct. 1564, 26 L. Ed. 2d 26 (1970)). "[T]he State has that duty as well as the duty of insuring that the trial is consistent with due process." ***Barker***, 407 U.S. at 527 (citing ***Hodges v. United States***, 408 F.2d 543, 551 (8th Cir. 1969)). Still, because Gibson did not assert his right to a speedy trial until a significant length of time had passed, this factor weighs in favor of the State.

### D. Prejudice Caused by Delay

¶42. The United States Supreme Court has explained the prejudice factor as follows:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious.

***Barker***, 407 U.S. at 532 (footnote omitted) (citations omitted). Gibson argues that substantial prejudice resulted from the delay because Thomas, his alibi, had passed away on June 13,

2020, more than two years and three months after Gibson was arrested. Gibson also maintains that his memory, as well as the memories of other witnesses, are open to serious challenges by the State due to the considerable passage of time.

¶43.    Thus, because a significant amount of time elapsed between Gibson's arrest and his indictment, because a key defense witness passed away during that time, and because the trial court improperly took judicial notice of a backlog in the medical examiner's office, we find that a proper *Barker* hearing is required. Therefore, we remand this case to the trial court to conduct a proper *Barker* hearing.

**II.      Whether the trial court erred by allowing inadmissible hearsay evidence.**

¶44.    Gibson next asserts that the trial court erred by allowing Agent Steed and Agent Dority to present inadmissible hearsay evidence. "When reviewing a hearsay challenge, this Court applies the abuse-of-discretion standard." *Augustine v. State*, 337 So. 3d 646, 649 (Miss. 2022) (citing *White v. State*, 48 So. 3d 454, 456 (Miss. 2010)). "An erroneous admission of hearsay can be deemed harmless if 'the same result would have been reached had the errors not existed.'" *Id.* (quoting *White*, 48 So. 3d at 456).

¶45.    Mississippi Rule of Evidence 801(c) defines hearsay as "a statement that: **(1)** the declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement." MRE 801(c). Hearsay is not admissible absent an applicable exception. MRE 802.

¶46.    We find that the trial court abused its discretion by allowing large amounts of

prejudicial hearsay testimony from Agent Steed and Agent Dority. The agents were allowed to testify, over the continuing objections of the defense, in great detail regarding what they learned during their investigation. "It is elemental that a police officer may show that he has received a complaint, and what he did about the complaint *without going into the details of it*." **Swindle v. State**, 502 So. 2d 652, 658 (Miss. 1987) (emphasis added) (citing **Tolbert v. State**, 407 So. 2d 815, 821 (Miss. 1981)). "When an officer's testimony is being used to explain why he did what he did in the course of his investigation, not to prove the truth of the matter asserted, then the testimony is not hearsay and is therefore admissible." **Dukes v. State**, 369 So. 3d 553, 562 (Miss. 2023) (citing **Eubanks v. State**, 291 So. 3d 309, 322-23 (Miss. 2020)). But "hearsay testimony obtained by an officer in conducting an investigation is inadmissible." **Swinney v. State**, 241 So. 3d 599, 609 (Miss. 2018) (internal quotation mark omitted) (quoting **Bridgeforth v. State**, 498 So. 2d 796, 800 (Miss. 1986)).

¶47. The agents' testimonies went far beyond explaining the course of their investigation. Agent Dority and Agent Steed were allowed to testify ad nauseam and over objection about interviews they had conducted with both Johnson and Brown and with people who did not testify at trial and whose statements were not admitted into evidence. Agent Dority testified that he had interviewed Jackson, Brandon's brother, and that Jackson had revealed to him that "he heard gunshots between 12:40 a.m. and 12:45 a.m. that morning midnight of the 13th going into the 14th." Jackson did not testify at trial.

¶48. Agent Dority later began to testify about what Johnson had informed him. Agent

22

Dority, over the objection of defense counsel, was allowed to testify:

Dority: He revealed the account of what occurred. And he said that himself—he was driving and that Buick car with Dwrone Brown and a gentleman named Calvin Gibson and they were riding around in his vehicle, the Buick LeSabre after midnight during the early hours of February 14th.

Mr. Johnson—which was Andrakious Johnson was driving the vehicle. He said that they drove to Old Tchula Road in Lexington, right here and parked the vehicle right in front of [Genous's] vehicle. And he said that [Genous] was seated in the driver's seat of his vehicle as he drove up.

He said as around the time they was driving up, he said they was talking about between him and Mr. Brown and Mr. Gibson. He said conversation arose in the vehicle about robbing [Genous] around the time they drove up. He said—Mr. Johnson stated that Brandon Cooper was walking and entered [Genous's] vehicle at or around the time that he was arriving up to and in front of the car. Mr. Genous'[s] car—because they parked facing, because he parked in front of Mr. Genous'[s] car. He said then Mr. Brown got out of his vehicle and walked over to [Genous's] vehicle and began speaking to Mr. Genous about obtaining some marijuana. He said shortly thereafter, Calvin Gibson exited his vehicle with a mask on and proceeded to rob [Genous]. He said Calvin Gibson walked up and [Genous's] vehicle and while attempting to rob [Genous]—he said Mr. Gibson shot into [Genous's] vehicle. He said Mr. Gibson then ran down the street while [Genous] exited his vehicle and began shooting at Calvin Gibson. Mr. Johnson revealed then that Brandon Cooper at the time excited [sic] [Genous's] vehicle and ran away. Around the same time that [Genous] was exiting the vehicle, the shoot [sic] Mr. Gibson. He said that [Genous] then reentered his vehicle and proceeded to drive away, he said while [Genous] was driving away, Mr. Brown discharged a shotgun at [Genous]. He said that then himself Mr. Brown and Calvin Gibson then fled the scene in his vehicle. And that was Mr. Johnson's . . . .

¶49. The State asked Agent Dority if Brown's story had been consistent with Johnson's,

and Agent Dority stated that it had been consistent. The trial court then stated: "Give me a summary now. . . . The summary of Mr. Brown." Defense counsel again objected, and the trial court acknowledged that defense counsel had a continuing objection. Agent Dority then testified in detail about Brown's interviews with law enforcement, including stating that "Calvin Gibson said he was going to try to rob [Genous]. . . . In Mr. Johnson's vehicle and Calvin Gibson intention [sic] to rob [Genous] as he exited [Johnson's] vehicle."

¶50.    The State asked Agent Dority, after he had stated that both Johnson and Brown had identified Gibson as being the third person in the car, if there had been any other evidence that led him to believe that Gibson "was in fact the shooter." Agent Dority responded: "Well, based on interviewing other individuals . . . yes. And then another female was interviewed that had seen the three of them together shortly . . . ." Defense counsel again objected on the grounds of hearsay, and the trial court overruled his objection. The record reflects the following:

State:      Okay. And you mentioned one of the individuals that indicated she had seen all three?

Dority:     Yes, ma'am.

State:      Was she able to ID positively Gibson, Brown and Johnson?

Dority:     Yes.

State:      And again, she did indicate that same night that she saw Gibson with the two?

Dority:     Yes, ma'am. A short time earlier obviously before this took place.

24

| State: | Did she state whether or not they had weapons or anything. |
| --- | --- |

. . . .

| Dority: | Yes, she did. She revealed that she observed them out and out about with firearms and also revealed their attire. |
| --- | --- |

Moreover, the State asked Agent Dority if he was able to determine the time of the shooting, and Agent Dority again was allowed to testify that Jackson told him that he heard the shots being fired between 12:40 a.m. and 12:45 a.m. and that Jackson had been "very specific about that with the time."

¶51. During Agent Steed's testimony, the prosecution asked Agent Steed whether he had interviewed Jackson. Agent Steed confirmed that he had and stated that "Raymond Jackson—he heard gunshot[s] during the early morning hours around 12 a.m. And he looked outside the residence, he didn't see anything and he went back to bed." Defense counsel then asked Agent Steed to relay what he had learned regarding "what exactly took place that evening as it relates to Brandon Cooper," and the following transpired:

| Steed: | On—during the early morning hours of February 14th, Brandon Cooper had talked with Grant Genous, they were supposed to meet outside the residence. And Mr. Genous— |
| --- | --- |

| Defense: | I'm going to object to hearsay. Testifying to hearsay. |
| --- | --- |

. . . .

| Court: | Overruled. |
| --- | --- |

. . . .

| Steed: | Mr. Grant Genous, he went over to see Brandon Cooper and he |
| --- | --- |

25

was parked on the street, Old Tchula Road, directly in front of Brandon Cooper's residence. At the time that Mr. Genous pulled up, he was waiting for Mr. Cooper to come outside the residence. And at the time, Mr. Genous, he was—he was also driving a Chevrolet Impala. He was parked in the road. He saw a vehicle coming towards him. This vehicle slowed down and the driver asked him if he had change for a twenty and he said no. The vehicle continued on down to the road, Old Tchula Road. And in the meantime, Mr. Cooper had made it to Mr. Genous's car, he got inside the car on the front passenger side. The purpose of that being Mr. Cooper was going to buy marijuana from Mr. Genous. Shortly thereafter this Buick LeSabre, it turned around and came back and it turned again and it was positioned directly in front of Mr. Genous's car?

State:     Okay.

Steed:     At that time a male got out of the car and he walked over to Mr. Genous's car and began to talk to him. And shortly thereafter, an individual got out and attempted to rob Mr. Genous. Brandished a firearm and pointed it at him. And at that time, the gun went off several times. Mr. Genous—he was afraid, he opened the door to knock the person away. The person retreated back down Old Tchula Road. Mr. Genous got out. They exchanged gunfire.

State:     Okay.

Steed:     That individual kept going. Mr. Genous got back in his car. As he was getting back in his car, Brandon Cooper got out and ran back towards his house. At the time that Brandon Cooper exited the car, it was unknown that he was hit at the time.

State:     Right?

Steed:     And he made it to the back doorsteps and collapsed. And at the time that Mr. Genous was trying to pull away, drive away in his car, another male subject got out of the car or retrieved a shotgun from that Buick LeSabre and begin [sic] firing a shotgun.

26

State:      Okay.

. . . .

State:      Now kind of backing up a little bit, you mentioned that when Grant and Brandon were in the vehicle, this second vehicle pulled up and someone got out of the car to talk to Brandon. Were you able to determine who that person was that got out of the car?

Steed:      So Dwrone Brown got out of the car and approach[ed] Grant Genous. And Andrakious Johnson was driving the car. And the other individual at the time, Grant Genous could not identify him. He had a mask or a hoodie that was closed pretty tight and had gloves on.

State:      Okay.

Steed:      So he couldn't identify him at that time.

Agent Steed continued to testify in detail about what Brown and Johnson had informed him during the investigation over the objections of defense counsel.

¶52.   Agent Steed also was allowed to testify regarding his conversation with Watson. The transcript reflects the following:

State:      Now also during your investigation, did you speak to any other witnesses who may have indicated seeing the three together, Calvin Gibson, Andrakious Johnson and Dwrone Brown that night together?

Steed:      Yes, ma'am. Ms. Son[y]a Watson.

At this point defense counsel again objected and argued that Agent Steed was being allowed to give critical evidence without the defense having a chance to cross-examine the declarant.

27

The trial court overruled the objection, and Agent Steed was allowed to continue his testimony:

> State: Now again, you mentioned that you spoke to a Ms. Watson. What did she say about seeing the three individuals?
>
> Steed: Ms. Watson—she said that she saw Andrakious Johnson[,] Dwrone Brown[,] and Calvin Gibson together on February the 13th, 2018. Ms. Watson went onto to [sic] describe what they were wearing.
>
> State: Okay.
>
> Steed: And she said that they had firearms.
>
> State: Okay.
>
> Steed: And she said that Mr. Johnson was wearing a black shirt. Mr. Gibson was wearing a red shirt and Mr. Brown was wearing a white shirt. And she said that they were in Mr. Gibson's—at the time that she saw them, they were out in Mr. Gibson's vehicle.

On redirect, that State again referred to Watson and stated:

> State: Now again, Sonya Watson she was able to ID seeing all three of these individuals that night, is that right?
>
> Steed: Yes, ma'am.
>
> State: Again, who did she indicate—who did she indicate that she saw that night, again the same night that Brandon Cooper was shot?
>
> Steed: She told me Andrakious Johnson, Dwrone Brown[,] and Calvin Gibson.

Agent Steed later confirmed that Watson had seen Gibson with Brown and Johnson the night of February 13, 2018, and confirmed that she had remembered what they were wearing and

28

that she saw them with firearms.

¶53. The State also asked Agent Steed whether he had spoken to William Terry, who also did not testify at trial. Agent Steed confirmed that he had spoken to Terry and stated that Terry had "hung out with" Johnson, Brown, and Gibson the night of February 13, 2018. Defense counsel objected, and his objection was again overruled. Agent Steed then stated that Terry had been riding about with Johnson, Brown, and Gibson and that they had been looking to rob someone. Defense counsel raised another objection at that point, and the trial court sustained defense counsel's objection but did not ask the jury to disregard that testimony. The State asked Agent Steed whether he had spoken to any other witnesses who were able to identify Johnson, Brown, and Gibson as being together on the night of February 13, and Agent Steed indicated that Terry, Thomas, and Watson had each stated that they had seen the three men together.

¶54. These statements made by Agents Dority and Steed were clearly hearsay statements that went beyond explaining the course of their investigation. Moreover, the State used the hearsay testimony to prove the truth of the matter asserted. During Gibson's cross-examination, the prosecutor asked Gibson, "And you also heard that the agent's [sic] testify that Sonya Watson saw you, Brown and Johnson that night together with guns, isn't that correct?" The prosecution also asked Gibson, "[d]id you hear Agents Dority and Agent Steed indicate that they had talked with a Sonya Watson and she told them that she saw you, Johnson[,] and Brown with guns, isn't that correct?" During its closing argument, the State

29

argued to the jury: "In addition to the statements of the co-defendants, you have three people who are not even related to the crime that put them together that evening. You have Ms. Sonya Watson, who came and made a voluntary statement and stated that she saw them together . . . ." Further, the State told the jury:

> But now she's supposedly the alibi that said that he was there at a certain time. But those times matter. . . . They talked with the brother who was at the home who lived there, said the first shots that he heard, that woke him up was about 12:40 as well, it was all in the same 15 minute window.

The State further stated: "Once again ladies and gentlemen, these times are important . . . . At 10:30 approximately, Gibson, Johnson and Brown leave Tanika's house. We know that because the co-defendants tell us they did. They are seen all around town. Sonya Watson saw them."

¶55. This Court previously found in a burglary case that an investigating officer's testimony that "he was 'advised that [the church members] thought something was missing out of the auditorium" was impermissible hearsay that should have been excluded as evidence. *Harrison v. State*, 722 So. 2d 681, 684 (Miss. 1998) (alteration in original). This Court pointed out that the officer "could have testified to what he determined to be missing based on his first hand knowledge. The State also could have presented the declarant as a witness and asked him or her directly if they believed anything was missing from the church." *Id.* The Court ultimately found that the admission of the officer's statement was harmless error. *Id.*

¶56. The hearsay testimony in this case greatly exceeded the officer's statement in

30

*Harrison*. The agents also went far beyond "explain[ing] an officer's course of investigation or motivation for the next investigatory step by that officer." *McCollum v. State*, 372 So. 3d 980, 988 (Miss. 2023) (internal quotation mark omitted) (quoting *Eubanks*, 291 So. 3d at 322-23). The "long-standing principle" that officers may explain the course of the investigation "does not allow investigators free rein to testify about anything that their investigation revealed." *Broome v. State*, 402 So. 3d 152, 156 (Miss. 2025). "Investigators cannot be permitted to relate to the jury hearsay which is incriminating in its effect as to a defendant on trial for a crime." *Bridgeforth*, 498 So. 2d at 800 (internal quotations marks omitted) (quoting *Ratcliff v. State*, 308 So. 2d 225, 227 (Miss. 1975)). Accordingly, the trial court clearly abused its discretion by allowing inadmissible hearsay evidence.

¶57. This Court "do[es] not reverse a conviction for an erroneous evidentiary ruling unless 'the error adversely affects a substantial right of a party,' or in other words, unless the ruling prejudiced the accused." *Broome*, 402 So. 3d at 157-58 (internal quotation mark omitted) (quoting *Smith v. State*, 136 So. 3d 424, 435 (Miss. 2014)). The harm done by the inadmissible evidence was significant. The agents were allowed to testify in depth as to what each person that they had interviewed during their investigation had informed them, essentially forming the foundation of the State's entire case. Genous was unable to identify the person who approached his window and fired the weapon. Thus, the evidence presented against Gibson was largely based on the testimony of his codefendants, who had accepted plea deals in exchange for their testimony. Brown's and Johnson's testimonies also contained

inconsistencies. Therefore, the agents' statements that Watson had also seen Gibson with Johnson and Brown that night and that she had witnessed them brandishing firearms was highly prejudicial. Further, the State admitted that, due to Thomas's statement, the timing of the shooting was an essential part of their case against Gibson. Yet both agents were allowed to testify that Jackson, who was not a witness at trial, had told them exactly what time he heard shots fired outside of Brandon's home.

¶58.    Furthering the error, Agent Dority and Agent Steed were the first witnesses called for the State. Thus, they "set the stage" for the State's case, before Brown and Johnson had implicated Gibson in their testimonies. *Broome*, 402 So. 3d at 162 (Griffis, J., concurring in part and dissenting in part). "It is abundantly clear that the trial court erroneously admitted [the agents'] hearsay statements, and [their] testimon[ies] allowed the State to unfairly bolster [Brown's and Johnson's] testimon[ies]" which prejudiced Gibson. *Id.* at 164. We find that the rife amount of inadmissible hearsay allowed in this case unduly prejudiced Gibson.

¶59.    In addition to the improper testimonies of Agents Dority and Steed, the State was allowed to cross-examine Gibson about a portion of Thomas's statement that was not admitted into evidence and to which no witness had testified. The State repeatedly asked Gibson if a person would be lying if they had said that Gibson always carried a gun. The State also questioned Gibson about whether he recalled telling Thomas that it was his gun that was used in the shooting. Defense counsel objected and argued that there had been no testimony to support the State's questioning and that no witness had testified that his gun was

32

involved in this case. The trial court stated, "[w]ell, the jury will recall the testimony." The prosecution continued:

> State: You don't recall telling your girlfriend that it was your gun that was used in the shooting?
>
> Gibson: I do not recall.
>
> State: So if she said that, she would be lying?
>
> Gibson: I don't recall.
>
> State: You don't recall telling her that? Or you don't recall ever owning a gun? You just stated you didn't own a gun, you never owned a gun?
>
> Gibson: I don't recall me telling her that.
>
> State: So she could have said it—if you don't recall?
>
> Gibson: I don't recall that. And it would have been a lie.
>
> State: So she was lying then?

The cross-examination continued with the State continually questioning Gibson about part of Thomas's unsworn statement that was not admitted into evidence and to which no witness had testified. The State then asked to approach Gibson, and defense counsel once again objected to any statements that had not been allowed into evidence. Defense counsel argued to the trial court that it had previously ruled that the remaining portions of Thomas's statement would not be admitted into evidence. The trial court overruled the objection and allowed the State to impeach Gibson's testimony with Thomas's unsworn statement.

¶60.   It was improper for the trial court to allow the State to impeach Gibson's testimony

with an unsworn statement of a person who did not testify at trial. ***Melton v. State***, 723 So. 2d 1156, 1160 (Miss. 1998). As this Court stated in ***Jackson v. State***,

> A 'prior statement by a witness' offered to show inconsistency with testimony at trial also is not hearsay. M.R.E. 801(d)(1). This rule, however, applies only to prior inconsistent statements of testifying witnesses. "Whereas an inconsistent statement by a testifying witness can be used to impeach that witness's credibility, an inconsistent account by another source is offered to show an alternative view of the truth." ***U.S. v. Bao***, 189 F.3d 860, 866 (9th Cir. 1999) (quoting ***Bemis v. Edwards***, 45 F.3d 1369, 1372 (9th Cir. 1995)). "Only the declarant of the prior inconsistent statement, and not another witness, may be impeached with the statement." ***Id.***

***Jackson v. State***, 245 So. 3d 433, 442 (Miss. 2018). Moreover, "it is of the utmost importance that counsel have 'a good faith basis for any question asked on cross-examination; therefore, counsel may not use prior inconsistent statements as a "guise of impeachment for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible."'" ***Flowers v. State***, 842 So. 2d 531, 551-52 (Miss. 2003) (quoting ***Flowers v. State***, 773 So. 2d 309, 326 (Miss. 2000)). As discussed below, the State used Thomas's unsworn statements as substantive evidence during its closing argument.

¶61. Because inadmissible hearsay testimony was used to establish key points of the State's case during trial and because it greatly prejudiced Gibson, we reverse Gibson's convictions and remand this case for a new trial.

**III.    Whether Gibson was denied his constitutional right to a fair trial due to prosecutorial misconduct.**

¶62. Gibson lastly argues that during closing arguments, the prosecution asserted facts that were not in evidence. Gibson takes issue with the prosecution's following statements:

34

You've heard from Andrakious Johnson. You've also heard from Dwrone Brown. They both gave statements to the police and in all of these statement[s], there's one constant thing that they've said that this man right here, got out of the car, with no legal justification at all and shot Brandon Cooper in cold blood, sitting in front of his house, trying to rob Grant Genous. Trying to rob Grant Genous, he took a gun, walked up on a car, tried to rob this man, that gun went off and unfortunately, that bullet hit Mr. Cooper and took his life.

¶63. The prosecution also repeatedly and inaccurately stated that Gibson admitted having a gun and that he had told Thomas that the gun used in the shooting was his. For example, the prosecution began closing argument, stating that "Calvin Gibson told his girlfriend, my gun killed . . . ." Defense counsel objected and argued that no evidence supported this statement. The trial court overruled the objection. Defense counsel requested a continuing objection, which the trial court granted. The State then said, "Again, Brandon Cooper is dead because of this man right here. And Mr. Gibson testified—where the evidence comes from—he sat right there and he stated that he told his girlfriend that that gun belonged to him."

¶64. The prosecution later stated:

You know, one bullet didn't match though. It was the bullet that came out of Brandon Cooper's body. The bullet that that man right there put, when he was trying to rob them that night.

Where is that gun? The gun that he admitted was a part of this heinous crime? A part of this capital murder. Where is that gun?

The prosecution continued, stating: "There's a third gun, ladies and gentlemen, that Mr. Gibson admitted was involved in this crime but it wasn't tested, nor was it provided." The

35

prosecution again stated, "We still have this man right here admitting that this gun was part of the situation with no concrete alibi, at around 1245 A.M. on February 14, 2018, shooting an armed pistol into the car . . . ." Yet again, the prosecution stated:

> Jury instruction number five just defines what a deadly weapon is. And a gun is considered a deadly weapon, ladies and gentlemen. And Mr. Gibson when he was being impeached on that stand about the statement, slash alibi or alleged alibi, that was coming, he admitted that he told her that the gun involved in this particular shooting, this attempted robbery, this capital murder was his. He admits that he had the gun. He admits that it was his.
>
> Can't get any simpler than that. That's common sense.
>
> . . . .
>
> But you were with Johnson and Brown at your house that same evening. And you admit that's your gun that was used in this robbery.
>
> . . . .
>
> We have a survivor that tells you that Brown and Johnson are the shooters and that the third person came and shot that gun. And you have him admitting that that gun that was involved was his.

¶65. Defense counsel addressed the prosecution's statements during his closing argument and informed the jury that he had "never heard Mr. Gibson say that his gun was involved in anything. He said he didn't have a gun back then. He said, he never never had a gun—because he didn't it [sic]."

¶66. During the State's rebuttal argument, a different member of the prosecution informed the jury that his colleague had misstated evidence. He said that, although the prosecutor had informed the jury that Gibson had admitted having a gun, Gibson actually had testified that

he had not possessed a gun and had never owned a gun. The prosecutor then stated that it was Gibson's girlfriend that had indicated that Gibson's gun had been used in the shooting and that she had stated that Gibson always carried a gun.

¶67. "Arguing statements of fact that are not in evidence or necessarily inferable from it which are prejudicial to the defendant is error." *Randall v. State*, 806 So. 2d 185, 212 (Miss. 2001) (internal quotation marks omitted) (quoting *Dancer v. State*, 721 So. 2d 583, 589 (Miss. 1998)). Clearly, it was error for the prosecution repeatedly to tell the jury that Gibson had admitted owning a gun and that he had admitted that his gun was involved in Brandon's shooting. The transcript shows that Gibson had steadfastly maintained during his testimony that he had not possessed a gun.

¶68. The prosecution did admit its error during rebuttal and informed the jury that Thomas, not Gibson, had stated that Gibson always carried a gun and that his gun had been used in the shooting. As stated above, however, the trial court improperly allowed the State to impeach Gibson's testimony with Thomas's unsworn statement. Compounding this error is this Court's longstanding holding that "prior, inconsistent statements admitted for impeachment purposes cannot be used as substantive evidence." *Martindale v. Wilbanks*, 744 So. 2d 252, 254-55 (Miss. 1999) (citing *Parker v. State*, 691 So. 2d 409, 413 (Miss. 1997)). Not only did the State repeatedly misrepresent evidence in its closing argument, it also clearly used impeachment evidence as substantive evidence. Therefore, this error, especially in addition to the trial court's allowance of large amounts of hearsay testimony, requires reversal.

**CONCLUSION**

¶69. The errors in this case involving inadmissible hearsay testimony, misrepresentation of evidence, and improper use of impeachment evidence require the reversal of Gibson's convictions. Therefore, we reverse Gibson's convictions and remand this case for a new trial. Because the trial court erred by taking judicial notice of a backlog in the medical examiner's office without requiring the State to provide evidence that the backlog was the cause of the more-than-four-year delay between Gibson's arrest and his indictment, as an initial matter on remand, the trial court shall conduct a proper ***Barker*** analysis.

¶70. **REVERSED AND REMANDED.**

**RANDOLPH, C.J., COLEMAN, P.J., ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**